## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| KAMAL K. PATEL,<br>Reg. No. 56496-080<br>CI Big Spring Correctional Institution<br>2001 Rickabaugh Dr.<br>Big Spring, TX  79720<br><br>and<br><br>DALE BROWN<br>Reg. No. 29087-004<br>CI Rivers Correctional Institution<br>P.O. Box 630<br>Winton, NC  27986<br><br>Plaintiffs,<br><br>v.<br><br>THE FEDERAL<br>BUREAU OF PRISONS<br>320 First Street, N.W.<br>Washington, D.C.  20534<br><br>and<br><br>HARLEY LAPPIN, in official and<br>individual capacities,<br>320 First Street, N.W.<br>Washington, D.C.  20534<br><br>Defendants. | **THIRD AMENDED CLASS COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>**Civil Action No. 09-cv-0200-RWR** |

## THIRD AMENDED CLASS COMPLAINT

1.     Plaintiffs Kamal Patel and Dale Brown, by and through their attorneys, bring the

following action arising out of the United States Constitution and the laws of the United States

and allege as follows.

## NATURE OF THE ACTION

2.     Plaintiffs are lawful permanent residents serving criminal sentences under custody

of the Federal Bureau of Prisons ("BOP").  Plaintiffs were incarcerated for many years in federal

facilities operated by the BOP, where they were treated similarly to inmates born in the United States.

3.      Recently the situation changed for the worse.  Defendants began treating Plaintiffs, both of whom are long time lawful permanent residents, differently than similarly-situated United States citizens.  Plaintiffs were transferred based upon their national origin and/or alienage to private facilities, including Moshannon Valley Correctional Center ("MVCC"), Rivers Correctional Institution ("Rivers"), and Big Spring Correctional Institution ("Big Spring").  Plaintiffs were also told by Defendants that they would not be considered for transfer closer to their legal residences.

4.      MVCC and Big Spring are operated by Cornell Companies, Inc. ("Cornell"), a for-profit corporation with annual revenues exceeding $400 million.

5.      Rivers is operated by The GEO Group, Inc. ("Geo Group"), a for-profit corporation with annual revenues exceeding $1 billion.

6.      Cornell and Geo Group refuse to comply with applicable constitutional and statutory standards and claim they are not bound by BOP policies and procedures governing the treatment of federal prisoners.  Defendants Lappin and the BOP have failed to enforce applicable constitutional, statutory, and regulatory standards in facilities operated by private entities, including but not limited to Cornell and Geo Group.  As a result of Defendants' acts and omissions, Plaintiffs have been subjected to harsher prison conditions than similarly situated United States citizen federal prisoners.  The harsher treatment of Plaintiffs includes but is not limited to being required to subsidize the cost of their incarceration, substantially burdening their exercise of religion, providing fewer programming opportunities, and manifesting deliberate indifference to their exposure to harmful levels of secondhand tobacco smoke.

7.      The United States Government Accountability Office (then known as the General Accounting Office) concluded in 1991 that the BOP lacks statutory authority to confine federal prisoners in such private facilities and warned Congress that if such authority were to be granted, controls should be established to preserve prisoner rights, ensure contractor accountability, and provide for effective government oversight.

8.      Defendants continue to confine aliens in private facilities without statutory authority and without preserving prisoner rights.   In doing so, Defendants have delegated authority to private parties in violation of their statutory and regulatory obligations.

9.      Rivers is more than 500 miles from Plaintiffs' respective legal residences. Plaintiffs' family members either cannot visit Rivers or can do so only with great difficulty and at significant expense.   Inmates who have eighteen consecutive months of clear conduct in a general population, as do Plaintiffs, are considered for transfer to facilities nearer to their families.   United States citizen inmates with detainers or charges pending from another jurisdiction remain eligible for such transfers, although they generally are not transferred to facilities more distant from the detaining authority.   In stark contrast, the BOP categorically excludes from consideration for such transfers aliens who are the subject of a notification letter from the U.S. Immigration and Customs Enforcement agency ("ICE") stating only that an investigation has been initiated to determine whether the inmate is subject to removal from the United States.   It is unlawful for the BOP to treat alien federal prisoners differently for this purpose than it treats similarly situated United States citizen prisoners such as those subject to detainers or serving life sentences.   Further, the BOP impermissibly assumes that aliens subject to ICE detainers for a hearing will be removed even though they have not yet been afforded a removal hearing and no order of removal has been issued.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction under 28 U.S.C. § 1331 and the United States Constitution.

11.     Venue is proper in this district under 28 U.S.C. § 1391.

12.     Plaintiffs have exhausted administrative remedies and bring claims under the Fifth Amendment to the United States Constitution, the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb *et seq.*, the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq*., the Freedom of Information Act, 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a.

## PARTIES

13.     Kamal K. Patel is a Plaintiff in this action.  Mr. Patel is a lawful permanent resident of the United States.  He previously was confined at Rivers in Winton, North Carolina, and he is presently confined at Big Spring in Big Spring, Texas.  On information and belief, Mr. Patel was transferred from Rivers to Big Spring to facilitate his participation in legal proceedings in Texas, and he remains subject to transfer back to Rivers upon conclusion of such proceedings.

14.     Dale Brown is a Plaintiff in this action.  Mr. Brown is a lawful permanent resident of the United States and is presently incarcerated at Rivers.

15.     Defendant BOP is an agency of the United States Department of Justice established in 1930 to oversee the confinement of federal prisoners. The BOP consists of 115 institutions, 6 regional offices, a Central Office, 2 staff training centers, and 28 community corrections offices.  The Central Office serves as the headquarters for the BOP and is located in Washington, D.C.

16.     Defendant Harley G. Lappin is Director of the BOP and is responsible for its acts and omissions.  His office is located in Washington, D.C.  Defendant Lappin is sued in his official and individual capacities.

## CLASS ALLEGATIONS

17.     Plaintiffs bring Counts One through Seven and the allegations related thereto on their own behalf and on behalf of all others similarly situated pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 23.

18.     "Federal prisoner" as used in this Third Amended Complaint means a person described in § 3621(a) of Title 18.   "Federal prisoner" excludes persons sentenced to incarceration under the District of Columbia Code, as described in Pub. L. 106-553, § 1(a)(2), Dec. 21, 2000, 114 Stat. 2762, 2762A-68; renumbered § 114, Pub. L. 106-554, § 1(a)(4) [Div. A, § 213(a)(2)], Dec. 21, 2000, 114 Stat. 2763, 2763A-179.

19.     Plaintiffs seek certification of the following classes and subclasses:

a.      CLASS ONE (injunctive and declaratory relief class pursuant to Fed. R. Civ. P. 23(b)(2)):   All federal prisoners confined in facilities operated by private entities. (COUNTS ONE, TWO, THREE, AND FOUR).

i.      SUBCLASS ONE-A (injunctive and declaratory relief subclass pursuant to Fed. R. Civ. P. 23(b)(2)):  All federal prisoners confined in private facilities managed by Geo Group.  (COUNT SIX).

ii.     SUBCLASS ONE-B (injunctive and declaratory relief subclass pursuant to Fed. R. Civ. P. 23(b)(2) and damages subclass pursuant to Fed. R. Civ. P. 23(b)(3)): All Muslim inmates confined in private facilities managed by Geo Group.  (COUNT FIVE).

b.      CLASS TWO (injunctive and declaratory relief class pursuant to Fed. R. Civ. P. 23(b)(2)):   All federal prisoners subject to a detainer for a hearing issued by the Department of Homeland Security's Immigration and Customs Enforcement agency ("ICE") or the Immigration and Naturalization Service ("INS").  (COUNT SEVEN).

20.      The members of the classes and subclasses are so numerous that joinder of all members is impractical.

21.      There are questions of law or fact common to the classes and subclasses.

22.      The claims or defenses of the representative parties are typical of the claims or defenses of the classes and subclasses.

23.      The representative parties will fairly and adequately protect the interests of the classes and subclasses.

24.      With regard to all classes and subclasses, which are Rule 23(b)(2) injunctive relief classes, Defendants have acted or refused to act on grounds that apply generally to the classes and subclasses, so that final injunctive and declaratory relief are appropriate respecting the classes and subclasses as a whole.

25.      With regard to Subclass One-B, also a Rule 23(b)(3) damages class, questions of law or fact common to the subclass members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and effectively adjudicating the controversy.

## FACTUAL BACKGROUND

**The Bureau of Prisons**

26.     Before federal prisons were built, federal prisoners were confined in state facilities at federal expense.

27.     In states unwilling to accept federal prisoners, the First Congress permitted the federal marshal to hire a convenient place to serve as a temporary jail.

28.     Later Congresses continued to authorize the marshal service to contract for temporary facilities for confinement until permanent arrangements could be made.

29.     By the end of the nineteenth century, due to overcrowding in state prisons, some states stopped accepting federal prisoners convicted in other states and one refused to accept federal prisoners at all.   In 1891, Congress authorized construction of the first federal penitentiaries.  Congress created the BOP in 1930 to provide more progressive and humane care for federal prisoners, to professionalize the prison service, and to ensure consistent and centralized administration of the eleven Federal prisons in operation at the time.

30.     Historically, federal, state, and local correctional agencies entered into contracts with the private sector to provide services such as food preparation and medical care, as well as certain pre-release programs.

31.     As a result of expanded federal law enforcement and new legislation that altered sentencing, the 1980s brought a significant increase in the number of federal inmates.

32.     From 1980 to 1989, the inmate population more than doubled, from just over 24,000 to almost 58,000.  During the 1990s, the population more than doubled again, reaching approximately 136,000 at the end of 1999.

33.     In the 1980s and 1990s, the BOP expanded its use of private sector resources in response to growing inmate populations and escalating costs.  The BOP expanded beyond

contracting for goods or services within BOP-operated facilities to contracting with private corporations to operate private prisons housing federal prisoners ("private facilities" or "private prisons").  Upon information and belief, the BOP does not use such private facilities to confine United States citizen federal prisoners for its general adult inmate population, with the exception of District of Columbia offenders whose confinement is governed by unique statutory authority.

34.    In 1991, the agency then known as the United States General Accounting Office ("GAO") reviewed BOP's practice of confining federal prisoners in private facilities.  The GAO concluded that the BOP lacks statutory authority to confine federal prisoners in private facilities.

35.    The GAO further found that even if Congress were to authorize the BOP to confine federal prisoners in private facilities, controls on contracting should be established to preserve prisoner rights, ensure contractor accountability, and provide for effective government oversight.

36.    Congress has not enacted legislation authorizing the BOP to confine federal prisoners in private facilities, other than District of Columbia offenders.

37.    Further, the BOP has been unable to demonstrate private facilities are more efficient or cost effective than BOP facilities.

38.    Today, the BOP exercises custody over approximately 209,000 federal prisoners, including the Plaintiffs.

39.    Approximately 82 percent of these federal prisoners are confined in federal facilities operated by the BOP, with the balance, including Plaintiffs, in privately-managed or community-based facilities and local jails.

40.     BOP confines non-U.S. national federal prisoners (including lawful permanent residents) in these privately-operated secure facilities including but not limited to MVCC, Rivers, and Big Spring.

41.     The BOP retains custody of and responsibility for all persons sentenced to a term of imprisonment under Title 18 of the U.S. Code ("United States prisoners" or "federal prisoners").

42.     Congress has mandated that the BOP maintain charge over, and management and regulation of, all federal prisoners, wherever confined.

43.     Congress has mandated that the BOP provide for the safekeeping, care, and subsistence of all federal prisoners, wherever confined.

44.     Congress has mandated that the BOP provide for the protection, instruction, and discipline of all federal prisoners, wherever confined.

45.     Congress has mandated that the BOP establish appropriate standards of health and habitability for facilities in which federal prisoners are confined.

46.     Congress and BOP regulations prohibit Defendants from redelegating authority to private parties.

47.     Defendants' use of private prisons results in the unlawful delegation of authority to private entities and persons through management activities such as promulgation of rules different than those applicable to BOP facilities, day-to-day management decisions, and disciplining of federal prisoners by employees of private entities.

**Defendants' Transfer Policies Are Unlawful As Applied to Plaintiffs**

48.     Congress has mandated that the BOP consider on a case-by-case basis five factors in designating federal prisoners to serve confinement in a particular facility and in making decisions to transfer such prisoners between facilities.

49.     The BOP may not disregard these statutory factors in making initial designation or transfer decisions.

50.     Defendants transferred Plaintiffs to private facilities based upon their national origin and/or alienage without appropriately considering the relevant statutory factors.

51.     Plaintiffs are treated differently and worse in private facilities than inmates in BOP facilities with respect to conditions as to which they are similarly situated.

**Defendants Lack Authority To Designate Plaintiffs to Private Confinement Facilities**

52.     Plaintiffs are federal prisoners in the custody of Defendants.

53.     Congress has enacted laws that constrain Defendants' authority to classify and designate the place of confinement for federal prisoners.

54.     Congress has permitted federal prisoners in the custody of the BOP to be confined in federal penal or correctional institutions or in facilities operated by officials of a State, Territory, or political subdivision.

55.     Congress has not authorized Defendants to confine United States prisoners in facilities operated and managed by private entities (i.e., private facilities).

56.     The state of North Carolina has prohibited the operation of any correctional facility for confinement of inmates serving sentences for violation of laws of a jurisdiction other than North Carolina, except facilities owned or operated by the federal government and used exclusively for the confinement of inmates serving sentences for violation of federal law.

57.     On information and belief, Rivers Correctional Institution is owned and operated by Geo Group not the federal government.

**Rivers Correctional Institution**

58.     Rivers Correctional Institution ("Rivers") is a low-security correctional facility with a capacity of approximately 1380 males.

59.     Rivers is owned, operated, and managed by the Geo Group.

60.     Geo Group is a private, for-profit corporation with 2009 revenues in excess of $1 billion.

61.     Defendants have initiated a practice of transferring other federal prisoners to Rivers based upon national origin and/or alienage.

62.     The practice of classifying and designating federal prisoners based upon national origin and/or alienage violates the Fifth Amendment to the United States Constitution and Defendants' own regulations.

63.     The practice of classifying and designating prisoners based upon national origin and/or alienage has not been subject to notice and comment in accordance with the Administrative Procedure Act.

**Defendants Refuse To Require Geo Group To Abide by Applicable Constitutional, Statutory, and Regulatory Standards in the Management and Operation of Rivers**

64.     Plaintiffs filed numerous requests with Geo Group seeking to enforce applicable constitutional, statutory, and regulatory standards at Rivers.

65.     Plaintiffs requested that Geo Group follow applicable constitutional, statutory, and regulatory standards concerning religious freedom (pertaining to diet and prayer), exposure to secondhand tobacco smoke, access to courts and counsel (including availability of writing paper and envelopes), communication with family, commissary prices, telephone charges, email,

programming opportunities, and freedom from arbitrary search and seizure of legal papers and other property.

66.     Geo Group denied Plaintiffs' requests to adhere to constitutional, statutory, and regulatory standards applicable to the BOP and federal penal and correctional institutions.

67.     Defendants have failed to require Geo Group to abide by applicable constitutional, statutory, and regulatory requirements.

68.     Plaintiffs have exhausted their administrative remedies.

**It is Unlawful for Defendants To Utilize Commissary Fund Monies To Offset the Cost of Contracts for the Management of Private Prisons**

69.     Defendants have directed that income received by the contractor in excess of expenses incurred for telephone usage shall offset the cost of their contracts with private entities for the management and operation of private prisons.

70.     Defendants permit Geo Group and other private corporations to charge much higher rates to non-U.S. citizens in private facilities than similar-situated U.S. citizens in BOP prisons for telephone usage and other commissary items.

71.     Defendants owe common law fiduciary duties to federal prisoners with respect to management of the Commissary Fund and Inmate Trust Fund.  Profits from the operation of the commissary are to be deposited in the Commissary Fund and ordinarily used for purposes which benefit the inmate body as a whole.

72.     Commissary Fund monies may be expended only for purposes provided by law. It is unlawful to use Commissary Fund monies to offset the cost of contracting for private prisons.

**It Is Unlawful for Defendants Categorically To Refuse To Consider Plaintiffs' Requests for Transfer to Facilities Closer to Their Legal Residence**

73.     Federal prisoners with eighteen consecutive months of clear conduct in a general population are considered for transfer to facilities nearer to family members.

74.     Federal prisoners with detainers or pending charges from another jurisdiction remain eligible for such transfer but generally are not transferred to facilities more distant from the detaining authority.

75.     The BOP treats alien federal prisoners differently than similarly situated federal prisoners who will not be released from BOP custody into the community.

76.     The BOP categorically excludes from consideration for such transfers aliens subject to an ICE detainer for a hearing.  In categorically excluding Plaintiffs from consideration on this basis, the BOP impermissibly assumes that they will be removed before they have been afforded a removal hearing or an order of removal has actually been issued.

77.     Plaintiffs were lawfully admitted to the United States more than thirty years ago and have extended families in communities that are more than 500 miles from Rivers.  Many of Plaintiffs' family members are United States citizens.

78.     Plaintiffs and their family members desire to engage in frequent visits, which they did when Plaintiffs were confined in facilities nearer their legal residences.

79.     Plaintiffs' family members either cannot or cannot without great difficulty visit Rivers.

80.     As a result, Plaintiffs receive fewer visits from family members while confined in Rivers than they did while confined in facilities closer to their legal residences.

**Plaintiff Kamal K. Patel**

81.     Plaintiff Kamal K. Patel was born in Leicester, England, in 1969, and is a British citizen.  When Mr. Patel was ten years old, he moved to the United States with his father, mother, brother, and sister.  He graduated as valedictorian of Alva High School, received a degree in Accounting from the University of Texas, and was in his first semester of law school at the University of Texas when he was arrested.

82.     Mr. Patel has lived in the United States for more than 30 years.

83.     Mr. Patel is a lawful permanent resident of the United States and has been since 1986.

84.     According to BOP records, Mr. Patel is a legal resident of Alva, Oklahoma.  Mr. Patel has family members located near Alva.

85.     In March 1993, Mr. Patel pled guilty and was sentenced to 293 months of incarceration and three years of supervised release on federal drug charges, and ten years (to run concurrently) for witness tampering.

86.     From March 1993 until August 2008, Mr. Patel was transferred to nine different BOP facilities.  Since August 2008, Mr. Patel has been confined in three private facilities, including Rivers.

87.     Mr. Patel began his confinement in March 1993 in **FCI Florence**, a medium-security BOP facility in Florence, Colorado.

88.     When his security level dropped in 1996 as a result of good conduct, Mr. Patel was transferred to **FCI Fort Worth**, a  low-security BOP facility in Fort Worth, Texas.

89.     Mr. Patel converted to Islam in 1998.

90.     In 1998, Mr. Patel was transferred to **USP Beaumont**, a high-security BOP facility in Beaumont, Texas.  Mr. Patel's transfer to this facility was prompted by a false charge of assault brought against him while he was confined in FCI Fort Worth.  This charge was later expunged by BOP in response to a lawsuit brought by Mr. Patel, and a federal court's finding that the charge was predicated upon false testimony.  Mr. Patel remained at Beaumont for two years.

91.     In 2000, Mr. Patel was transferred to **FCI El Reno**, a medium-security BOP facility in El Reno, Oklahoma.

92.     In 2000, Mr. Patel was again transferred to the **Federal Transfer Center** in Oklahoma City, Oklahoma.  While Mr. Patel was confined in Oklahoma, his family, including his mother, who is unable to travel long distances because of her health, was able to visit him on a regular basis.

93.     In July 2001, Mr. Patel was transferred to **FCI Bastrop**, a low-security BOP facility in Bastrop, Texas.

94.     In late 2001, Mr. Patel was transferred to **FCI Beaumont**, a low-security BOP facility in Beaumont, Texas.

95.     In 2003, Mr. Patel was transferred to **FCI Big Spring**, a low-security BOP facility in Big Spring, Texas.

96.     While at FCI Big Spring in 2003, Mr. Patel met David Duke and had reason to believe that Duke was given unlawful preferential treatment.

97.     Mr. Patel filed with prison officials a grievance concerning such unlawful preferences.

98.     Mr. Patel contacted the Office of Inspector General for the United States Department of Justice.  The Inspector General exposed a disturbing pattern of "discriminatory and retaliatory actions against Muslin inmates" at FCI Big Spring and specifically found that the Warden had unjustly ordered Mr. Patel transferred to the Special Housing Unit for more than 120 days for cooperating with the Inspector General's investigation.

99.     While confined in FCI Big Spring, Mr. Patel wrote a letter to the *Dallas Morning News* informing the newspaper of his impressions regarding Duke's treatment.  Mr. Patel's letter was motivated by his observation that David Duke was receiving favorable treatment based upon his notoriety and Mr. Patel's suspicion that prison officials embraced David Duke's racist ideas. Mr. Patel's suspicion is strongly supported by the findings of the Inspector General.

100.    In particular, Mr. Patel observed that David Duke was given an incident report for violating regulations by promoting, while incarcerated, his book *Jewish Supremacism: My Awakening to the Jewish Question*.  Rather than being given a high severity incident report— which would have required a disciplinary hearing, the mandatory loss of good-time credits, and placement in the Special Housing Unit—staff deliberately downgraded his offense and allowed him to avoid these consequences.

101.    Mr. Patel's letter was properly marked as protected by the First Amendment and not to be opened by prison officials.

102.    FCI Big Spring staff unlawfully opened Mr. Patel's letter, read it, and placed a memorandum in Mr. Patel's file concerning Mr. Patel's exercise of his First Amendment right to communicate with the press.

103.    Mr. Patel has unsuccessfully requested that the file be removed under BOP policy and the Privacy Act.

104.    In 2004, Mr. Patel was transferred to **FCI Forrest City**, a low-security BOP facility in Forrest City, Arkansas.  He remained at Forrest City for two years.

105.    In 2006, Mr. Patel was transferred to **FMC Butner**, a BOP medical center in Butner, North Carolina, to receive treatment for a herniated disc.  This was the last federal BOP facility in which Mr. Patel was confined.

106.    In August 2008, Mr. Patel was transferred for the first time to a private facility. Mr. Patel was sent to the **Moshannon Valley Correctional Center** ("MVCC"), a private, low-security facility in Philipsburg, Pennsylvania.  MVCC is owned and operated by Cornell, a for-profit corporation.

107.    In January 2009, Mr. Patel was transferred to **Rivers**, a private, low-security facility in Winton, North Carolina.  Rivers is owned and operated by Geo Group.

108.    In March 2010, Mr. Patel was transferred to **CI Big Spring**, a private, low-security facility in Big Spring, Texas, owned and operated by Cornell.

109.    Mr. Patel has had more than eighteen consecutive months of clear conduct.

110.    The BOP's decision to transfer Mr. Patel to private prisons has prevented him from maintaining a strong record of rehabilitation and close family and community ties.

**Plaintiff Dale Brown**

111.    Plaintiff Dale Brown is a federal inmate currently confined in Rivers.

112.    Mr. Brown is a Jamaican citizen and is a lawful permanent resident of the United States.

113.    Mr. Brown was born in Jamaica in 1965.  He came to the United States in 1979 with his mother, younger brother, and three younger sisters.

114.    Mr. Brown's mother, stepfather, brothers, sisters, and several other relatives are U.S. citizens or lawful permanent residents.

115.    Mr. Brown has been a lawful permanent resident for over 31 years. He entered the United States on May 28, 1979, and was admitted after inspection and authorization by immigration officials.

116.    Mr. Brown is a practicing Jehovah's Witness.

117.    Mr. Brown was awarded a college degree from the College of Arts, Kingston, Jamaica, now known as University of Technology.  He graduated as a Quantity Surveyor.

118.    On August 22, 1986, Mr. Brown registered with the Selective Service System.

119.    Prior to his arrest in 1991, Mr. Brown was gainfully employed as an assistant construction manager for Winn-Dixie Stores.

120.    As a result of his arrest, Mr. Brown was sentenced in 1992 to serve 300 months of imprisonment in federal prison (and five years of supervised release) on federal drug charges.

121.    According to BOP records, Mr. Brown's legal residence is Lauderdale Lakes, Florida.

122.    Mr. Brown has numerous family members in South Florida.

123.    In 1992, Mr. Brown began serving his sentence at **FCI McKean**, a medium-security BOP facility in McKean, Pennsylvania.

124.    While incarcerated at FCI McKean, Mr. Brown participated in several educational, vocational training, and religious programs offered by the institution.  He was also a member of the Pennsylvania Jaycees.  Mr. Brown participated in the college program offered by the University of Pittsburgh and excelled in the courses he took until the program was cancelled.

125.    On September 25, 1992, the INS issued a Notice of Action letter ("Detainer") to determine whether he is subject to deportation from the United States.  Mr. Brown has yet to be afforded any hearing pertaining to removal from the United States, to which he is entitled.

126.    Mr. Brown received a monetary award for his contributions in developing Life Safety and Handicap projects while he was incarcerated at McKean.  His supervisor indicated that the projects saved the BOP thousands of dollars.

127.    In 1998, Mr. Brown was transferred to **FCI Coleman**, a low-security BOP facility in Coleman, Florida.

128.    While at Coleman, Mr. Brown continued with his participation in the educational, vocational, recreational, and religious programs offered by the institution.  At Coleman, Mr. Brown was a member of the NAACP, he joined the inmate tutoring program to teach other inmates, and he led bible studies under the religious program.  Mr. Brown also continued with his college education by taking classes offered by the Lake Sumter Community College in his pursuit of a degree in Business Administration, and he earned fifteen credits with a 4.0 GPA.  The cost of Mr. Brown's college tuition and books were partially funded by his family, with money he earned from his prison job and with funds from a scholarship program offered by UNICOR, Mr. Brown's employer.

129.    UNICOR is a government corporation that employs inmates and provides them with training in job skills that will be useful upon release.

130.    UNICOR allows lawful permanent residents to participate in their programs, even if they are subject to an ICE detainer for a hearing.  UNICOR excludes only inmates with a final order of deportation.

131.    Mr. Brown has an extensive work history in the Bureau of Prisons, and the vast majority of his work performance evaluations have been outstanding.  For more than 12 years, Mr. Brown was employed by UNICOR.

132.    While at Coleman, Mr. Brown was also able to receive regular visits from his family in nearby areas of Florida.

133.    At Coleman, Mr. Brown worked as the factory manager's clerk and received favorable job reviews.

134.    In 2008, Mr. Brown was transferred to **Rivers**.

135.    Since his incarceration in Rivers, Mr. Brown has not been visited by his family due to the hardship of traveling to Winton, North Carolina, from South Florida.

136.    Mr. Brown's transfer to Rivers interfered with his ability to complete the business degree he started at Coleman.

137.    Mr. Brown has been a model prisoner.

138.    Mr. Brown has not had a disciplinary infraction in the nearly two decades he has been confined.

139.    Mr. Brown intends to remain in the United States following the completion of his sentence and apply for a waiver of deportation under § 212(c) of the Immigration and Nationality Act.

140.    A strong record of rehabilitation and strong family and community ties are important considerations in § 212(c) waivers.

141.    The BOP's decision to transfer Mr. Brown to Rivers has prevented him from maintaining a strong record of rehabilitation by foreclosing his ability to continue to participate in rehabilitative programs such as UNICOR and the college programs offered at BOP facilities.

142.    The BOP's decision to transfer Mr. Brown to Rivers has also prevented him from maintaining the close family and community ties that he was able to cultivate during his time in BOP prisons.

143.    On or about May 14, 2010, employees of GEO Group closed the prison library at Rivers and unlawfully seized inmates' legal papers and books, draft papers, and other materials.

144.    The items seized included Plaintiff Brown's mesh bag containing a draft motion, his legal folder, his address book, and other personal items, as well as legal materials of other inmates.

145.    Geo Group refused to return the seized items to the inmates, and upon information and belief, destroyed the items without affording the inmates the opportunity to reclaim the items or to contest their seizure.

146.    Defendants failed to enforce applicable BOP policies concerning possession of legal materials and search and seizure of private property.

**Restriction of Religious Freedoms**

147.    BOP regulations require prison officials to permit inmates to pray while on work detail.

148.    BOP regulations accommodate religious dietary restrictions of Muslim prisoners.

149.    By policy, Geo Group does not permit inmates at Rivers to pray while on work detail, nor does it adequately accommodate the religious dietary restrictions of Muslim prisoners.

150.    Defendants have failed to cause these BOP policies, which are mandated by the Religious Freedom Restoration Act, to be enforced at Rivers.

**Exposure to Secondhand Smoke**

151.   Outdoor exercise areas of Geo Group prisons have been designated for smoking.

152.   Any restrictions that are imposed on smoking are not enforced, causing secondhand smoke to be prevalent throughout Rivers and impossible for federal prisoners to avoid.

153.   Mr. Patel's asthma was aggravated as a result of secondhand smoke, necessitating the use of a new inhaler.

154.   Mr. Brown has suffered eye irritation and an aggravation of his allergies as a result of secondhand smoke.

**Additional Inequities in Rivers**

155.   Plaintiffs have been denied programmatic opportunities because of their status as permanent legal residents.

156.   Unlike inmates in BOP facilities, Rivers does not permit inmates to make unmonitored telephone calls to legal counsel.

157.   Rivers has informed federal prisoners that they must rely upon the mail system for confidential communications with attorneys.  This has impeded Plaintiffs' right to communicate with their attorneys.

158.   Moreover, federal prisoners in BOP prisons are provided with writing paper and envelopes free of charge.  Rivers has informed federal prisoners that private prisons are not required to follow this BOP policy.

159.   Further, inmates in private prisons are charged substantially higher rates for telephone calls and basic items from the commissary.  Revenue generated unlawfully is applied to the contract between BOP and the private prison, causing federal prisoners in private prisons

to subsidize their incarceration in a manner different than those in BOP facilities.  This practice violates applicable statutory, regulatory, and common law restrictions on the use of such funds, which are to be expended for the benefit of the inmate population.

160.     Plaintiffs and other inmates in private prisons pay much more than inmates in BOP prisons for the same commissary items.

161.     Federal prisoners in private prisons are not provided e-mail access like inmates in BOP facilities.

162.     Plaintiffs have exhausted administrative remedies with respect to these issues.

**Count One**
**Confinement of Federal Prisoners in Private Facilities**
Administrative Procedure Act
(Injunctive and Declaratory Relief Against All Defendants)

163.     Plaintiffs incorporate by reference Paragraphs 1 through 162 alleged above.

164.     Defendants have adopted a practice of confining federal prisoners in private facilities on the basis of national origin and/or alienage.

165.     With the exception of District of Columbia offenders, Congress has not authorized the BOP to confine federal prisoners in private facilities.

166.     Without observing the procedural requirements mandated by the Administrative Procedure Act, the BOP has adopted a practice of confining federal prisoners in private facilities.

167.     By confining inmates in private facilities based upon national origin and/or alienage, Defendants have failed to consider appropriate mandatory statutory factors.

168.     Defendants are acting in a manner that is arbitrary, capricious, an abuse of discretion, in excess of statutory authority, and without observance of procedure required by law.

169.     The confinement of federal prisoners at Rivers and other such private facilities violates applicable state laws.

**Count Two**
**Designation Based on National Origin and/or Alienage**
Equal Protection and Administrative Procedure Act
(Injunctive and Declaratory Relief Against All Defendants)

170.    Plaintiffs incorporate by reference Paragraphs 1 through 169 alleged above.

171.    Segregating prisoners in private facilities on the basis of national origin can only be justified if narrowly tailored to address a compelling governmental interest.

172.    The BOP practice of segregating prisoners in private facilities is not narrowly tailored to address a compelling governmental interest.

173.    Binding BOP regulations prohibit discrimination on the basis of national origin.

174.    The BOP practice of segregating prisoners in private facilities violates BOP regulations.

175.    There is no rational basis for segregating alien federal prisoners in private facilities.

176.    Defendants are acting in a manner that violates the Equal Protection Component of the Due Process Clause of the Fifth Amendment to the United States Constitution and binding BOP regulation.

**Count Three**
**Enforcement of Constitutional, Statutory, and Regulatory Standards in Private Facilities**
Equal Protection and Administrative Procedure Act
(Injunctive and Declaratory Relief Against All Defendants)

177.    Plaintiffs incorporate by reference Paragraphs 1 through 176 alleged above.

178.    Geo Group refuses to adhere to constitutional, statutory, and regulatory standards applicable to the treatment of federal prisoners.

179.    Defendants refuse to require Geo Group to adhere to constitutional, statutory, and regulatory standards applicable to the treatment of federal prisoners in connection with inmates confined at Rivers.

180.     The standards applied by Geo Group at Rivers have been adopted without observing procedural requirements mandated by the Administrative Procedure Act and constitute an unlawful designation of authority by BOP.

181.     Defendants' failure to enforce applicable constitutional, statutory, and regulatory standards at Rivers violates the Equal Protection Component of the Due Process Clause of the Fifth Amendment to the United States Constitution.

182.     Defendants' failure to enforce applicable constitutional, statutory, and regulatory standards at Rivers is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and results in the application of standards that have been adopted without observance of procedure required by law.

### Count Four
### Requiring Aliens To Subsidize Incarceration at Private Prisons
Administrative Procedure Act
(Injunctive and Declaratory Relief Against All Defendants)

183.     Plaintiffs incorporate by reference Paragraphs 1 through 182 alleged above.

184.     With limited exceptions, Congress requires the BOP to pay the expenses of federal prisoners out of the United States Treasury.

185.     Geo Group sells commissary items to inmates and requires inmates to pay for certain services such as use of telephones.

186.     Geo Group charges aliens substantially more for these services and items than inmates in federal facilities are charged.

187.     Profits from the sale of such items and services are applied to BOP's contracts with private entities, thereby reducing BOP's cost of incarcerating federal prisoners in private facilities.  As a result, inmates in private facilities who purchase such items and services are paying expenses that Congress requires to be paid out of the United States Treasury.

188.    Defendants' use of such funds violates applicable statutory, regulatory, and common law requirements.

189.    Defendants are acting in a manner that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and in excess of statutory authority.

**Count Five**
**Conditions of Confinement**
Religious Freedom Restoration Act
(Injunctive and Declaratory Relief Against BOP and Defendant Lappin in his Official Capacity)
(Damages Against Defendant Lappin in his Personal Capacity)

190.    Plaintiffs incorporate by reference Paragraphs 1 through 189 alleged above.

191.    Plaintiff Patel is a Muslim whose sincere religious beliefs require him to pray five times each day and adhere to special dietary restrictions.

192.    Mr. Patel was prohibited from praying while on work detail at Rivers, substantially burdening his exercise of religion.

193.    Mr. Patel was denied a diet conforming to his religious needs while confined at Rivers.

194.    The denial of Mr. Patel's requests was not the least restrictive means of furthering compelling governmental interests.

195.    BOP accommodates the religious practices of Muslims like Mr. Patel by allowing them to pray while on work detail and accommodating religious dietary needs in BOP facilities.

196.    Defendants refuse to require Geo Group to adhere to BOP policies concerning religious practices of Muslims.

197.    By refusing to require private entities such as Geo Group to follow BOP regulations, Defendant Lappin set in motion the conditions that led to the violation of Mr. Patel's rights under RFRA.

198.     Defendant Lappin is responsible for the acts and omissions of the employees and agents acting under his direction.

199.     Rivers and its employees act under color of federal law with respect to confinement of federal prisoners.

200.     Geo Group refuses to comply with the requirements of the Religious Freedom Restoration Act.

**Count Six**
**Conditions of Confinement**
Eighth Amendment
(Injunctive and Declaratory Relief Against All Defendants)

201.     Plaintiffs incorporate by reference Paragraphs 1 through 200 alleged above.

202.     Geo Group has failed to establish and enforce smoking areas at Rivers that prevent non-smoking inmates from being exposed to secondhand tobacco smoke.

203.     Defendants have failed to require Geo Group to enforce smoking policies applicable to BOP facilities.

204.     Plaintiffs' exposure to secondhand smoke at Rivers has caused adverse present health effects.

205.     Plaintiffs' exposure to secondhand smoke at Rivers will cause adverse future health effects.

206.     Defendants' and Geo Group's failure to protect federal prisoners from the effects of secondhand smoke is the result of deliberate indifference.

207.     Defendants' conduct violates the Eighth Amendment to the United States Constitution.

**Count Seven**
**Transfer Closer to Legal Residence**
Equal Protection and Administrative Procedure Act
(Injunctive and Declaratory Relief Against All Defendants)

208.    Plaintiffs incorporate by reference Paragraphs 1 through 207 alleged above.

209.    Defendants have categorically denied Plaintiffs consideration for transfer closer to their legal residences based upon alienage.

210.    Defendants permit similarly situated federal prisoners to be considered for such transfers.

211.    Defendants adopted this policy without observing the procedural requirements mandated by the Administrative Procedure Act.

212.    By categorically excluding Plaintiffs from consideration for transfer, Defendants have failed to consider the applicable statutory factors on a case-by-case basis, as they are required to do and therefore have acted in excess of statutory authority.

213.    By assuming that Plaintiffs will be deported based upon an ICE detainer for a hearing, Defendants have abused their discretion and acted contrary to law.

214.    Defendants' treatment of Plaintiffs violates the Equal Protection Component of the Due Process Clause of the Fifth Amendment to the United States Constitution and the Administrative Procedure Act.

**Count Eight**
**Privacy Act**
(Injunctive and Declaratory Relief Against BOP)

215.    Plaintiffs incorporate by reference Paragraphs 1 through 214 alleged above.

216.    In 2004, while incarcerated at FCI Big Spring, Plaintiff Patel wrote a letter to the *Dallas Morning News*, communicating what Mr. Patel believed was BOP employees' favorable treatment of David Duke, also an inmate at FCI Big Spring.

217.    The letter Mr. Patel wrote to the newspaper commented on the favorable treatment afforded David Duke by prison officials.  Mr. Patel's letter is protected speech under the First Amendment.  Mr. Patel marked the correspondence "Special Mail" to indicate that it was a protected communication.

218.    BOP policy prohibits BOP employees from opening correspondence marked "Special Mail" outside the presence of inmates.

219.    Contrary to BOP policy, BOP employees opened and read Mr. Patel's letter to the *Dallas Morning News*.

220.    Upon opening and reading Mr. Patel's letter to the *Dallas Morning News*, BOP personnel wrote a memorandum documenting Mr. Patel's communication with the newspaper and recommending that Mr. Patel be moved from FCI Big Spring to another facility as a consequence.

221.    The presence of this memorandum in Mr. Patel's files continues to be used by the BOP to discriminate against Mr. Patel.

222.    Under the Privacy Act, 5 U.S.C. § 522a(e)(7), the BOP is prohibited from maintaining any record "describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity."

223.    The BOP's continued maintenance of this memorandum in its entirety, without redaction of Mr. Patel's communication with the *Dallas Morning News*, is in violation of 5 U.S.C. § 522a(e)(7).

224.    Mr. Patel initiated an administrative remedy request to amend his record on February 20, 2010.  This request was finally denied on April 30, 2010.

225.    Under 5 U.S.C. § 522(g)(1)(A), Mr. Patel is provided a civil action against the BOP upon the Agency's "determination . . . not to amend an individual's record in accordance with his request, or fails to make such review in conformity with that subsection."

226.    The BOP's decision to maintain the unredacted memorandum in his files violates the Privacy Act.

**Count Nine**
**Documents Related to Office of Inspector General Report**
Freedom of Information Act
(Injunctive and Declaratory Relief Against BOP)

227.    Plaintiffs incorporate by reference Paragraphs 1 through 226 alleged above.

228.    On November 22, 2004, Mr. Patel filed a Freedom of Information Act ("FOIA") request to the Office of the Inspector General ("OIG") for documents related to an OIG Report.

229.    BOP provided Mr. Patel with 21 pages of documents, 15 of which were released in their entirety and 6 of which were redacted.  None of the exhibits or witness interviews associated with the OIG report—in which the OIG determined Muslims were being discriminated against—were provided, nor was any reason provided for their withholding.  BOP provided no index pursuant to *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973) ("*Vaughn Index*").

230.    Mr. Patel appealed this response.  BOP responded to this appeal on November 28, 2007, affirming its denial and stating, regarding the missing documents, that BOP's action "was limited to documents that were referred to it by OIG" and recommending that he ask for documents in a separate FOIA request.

231.    Mr. Patel filed similar requests with the BOP, two on February 14, 2005 and one on March 5, 2005.

232.    Pursuant to these three 2005 requests, on March 24, 2005 BOP provided Mr. Patel with a total of 10 pages.  No mention was made of the 40 page OIG report or the 99 exhibits attached to it.  No *Vaughn* Index was provided.

233.    Mr. Patel appealed this request on April 24, 2005, objecting to the missing documents.  A final denial was issued on May 18, 2007.

**Count Ten**
**Documents Related to Transfers**
Freedom of Information Act
(Injunctive and Declaratory Relief Against BOP)

234.    Plaintiffs incorporate by reference Paragraphs 1 through 233 alleged above.

235.    Mr. Patel has been transferred multiple times to various facilities over the past decade.

236.    On October 6, 2008, Mr. Patel made a request for documents relating to three separate transfers.  Mr. Patel provided a revised request on November 16, 2008.  That request was returned to Mr. Patel because it was missing a certificate of identity.  He re-sent the letter on January 29, 2009, according to a copy of the Certified Mail receipt attached with the letter.

237.    To date, Mr. Patel has not received any documents pursuant to this request.

238.    On February 1, 2009, Mr. Patel made a request for documents relating to a medical transfer request.

239.    The BOP denied this request on March 17, 2009.

240.    Mr. Patel appealed the BOP decision on March 26, 2009.

241.    To date, Mr. Patel has not received any documents pursuant to this request.

**Count Eleven**
**Documents Related to Protection Hearing**
Freedom of Information Act
(Injunctive and Declaratory Relief Against BOP)

242.     Plaintiffs incorporate by reference Paragraphs 1 through 241 alleged above.

243.     On April 25, 2009, Mr. Patel sent the BOP a request for documents related to a protection hearing while he was incarcerated at Moshannon Valley Correctional Center.

244.     On April 19, 2010, BOP released 247 pages in their entirety to Mr. Patel, 128 pages with redactions, and withheld 46 pages in their entirety.  It did not provide a *Vaughn* Index as to the withheld pages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and a judgment against Defendants:

1.     Declaring unlawful Defendants' practice of confining federal prisoners in private facilities and ordering Defendants to cease this unlawful practice;

2.     Declaring unlawful Defendants' practice of designating federal prisoners on the basis of national origin and/or alienage and ordering Defendants to cease this unlawful practice;

3.     Declaring that constitutional, statutory, and regulatory standards applicable to BOP facilities govern the treatment of federal prisoners in private facilities and ordering Defendants to cause such standards to be enforced;

4.     Declaring unlawful Defendants' practice of using revenue generated by the sale of goods and services to federal prisoners in private prisons to offset BOP contract costs for operation and management of such facilities and ordering Defendants to cease this unlawful practice;

5.     Declaring unlawful Defendants' failure to require Geo Group to comply with the Religious Freedom Restoration Act; ordering Defendants to enforce the Religious Freedom

Restoration Act in private facilities in which federal prisoners are confined; and ordering Defendant Lappin to pay an appropriate amount to be determined at trial;

6.      Declaring unlawful Defendants' failure to require Geo Group to comply with the BOP regulations on smoking in federal facilities and ordering Defendants to enforce such regulations in private facilities in which federal prisoners are confined;

7.      Declaring unlawful BOP's policy of categorically excluding from consideration from nearer to legal residence transfers aliens, including lawful permanent residents aliens, who are subject to an ICE or INS detainer for a hearing and ordering Defendants to consider Plaintiffs' requests for such transfers;

8.      Ordering Defendants to amend records pertaining to Mr. Patel to remove reference to Mr. Patel's exercise of his First Amendment rights;

9.      Ordering Defendants to produce in their entirety documents that have not been produced pursuant to Mr. Patel's Freedom of Information Act requests, to produce a *Vaughn* Index providing information for each and every withheld document, and to produce in full documents that have only been produced with redactions;

10.     Determining that this is a proper class action to be certified under Rule 23;

11.     Awarding Plaintiffs reasonable attorney's fees, expert witness fees, and other costs; and

12.     Awarding such other relief as this Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury as to all issues so triable.

<table>
<tr><td></td><td>Respectfully Submitted,</td></tr>
<tr><td>July 12, 2010</td><td>WILLIAMS & CONNOLLY LLP</td></tr>
</table>

By:  /s/ F. Greg Bowman

Thomas G. Hentoff (D.C. Bar No. 438394)
F. Greg Bowman (D.C. Bar No. 486097)
Christopher R. Hart (D.C. Bar No. 486577)
Embry J. Kidd (D.C. Bar No. 989586)
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000

*Attorneys for Plaintiffs*