## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **KAMAL PATEL,** | ) |  |
|  | ) |  |
|  | ) |  |
| **Plaintiff,** | ) |  |
|  | ) |  |
| **v.** | ) | **Civil Action No. 09-200 (RDM)** |
|  | ) |  |
| **BUREAU OF PRISONS, et al.,** | ) |  |
|  | ) |  |
|  | ) |  |
| **Defendants.** | ) |  |
|  | ) |  |

### MEMORANDUM OPINION

This matter is before the Court on Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment (Dkt. 68). For the reasons stated herein, the motion is **GRANTED** in part and **DENIED** in part. An appropriate order accompanies this Memorandum Opinion.

## I.   BACKGROUND

Plaintiff, Kemal Patel, filed this lawsuit *pro se* in 2009. *See* Dkt. 1. Patel is a citizen of the United Kingdom; when he filed suit, he was a legal permanent resident of the United States and was incarcerated in a facility run by Defendant Bureau of Prisons ("BOP"). *Id.* ¶ 4. The original complaint alleged that Patel was subjected to unfair treatment while incarcerated based on his status as a noncitizen—specifically, he alleged that BOP denied noncitizen inmates the same transfer and prison programming opportunities provided to U.S. citizens. *Id.* ¶¶ 15-38. An amended complaint, filed on June 8, 2009, added Dale Brown as an additional plaintiff and new claims under the Freedom of Information Act ("FOIA"). Plaintiffs filed a Second Amended Complaint on September 1, 2009, which added allegations that BOP had wrongfully assigned noncitizen inmates to private prisons where they were subjected to "significantly more onerous

conditions of confinement."  Dkt. 13 ¶¶ 53-69.

Plaintiffs obtained pro bono counsel in 2010.  *See* Dkt. 45.  On July 12, 2010, they filed a motion for leave to file a Third Amended Complaint.  Dkt. 65.  The Third Amended Complaint included eleven counts: challenges to the BOP's assignment and treatment of noncitizen inmates under the Equal Protection Clause and Administrative Procedure Act ("APA"); an alleged violation of the Religious Freedom Restoration Act ("RFRA"); an Eighth Amendment claim relating to exposure to second-hand smoke; a claim under the Equal Protection Clause and the APA relating to transfers of noncitizen inmates; a claim under the Privacy Act; and three FOIA claims.

Although Plaintiffs' motion for leave to amend was not granted until September 7, 2011, Dkt. 90, the instant motion was originally directed at the Third Amended Complaint.  *See* Dkt. 68 at 1.  Subsequently, both Patel and Brown were released from BOP custody.  In order to clarify the scope of the proceedings in light of their release, the Court granted Plaintiffs leave to file a Fourth Amended Complaint (the "Complaint").  Dkt. 118.  In the Fourth Amended Complaint, Brown no longer appears as a plaintiff and Patel has dropped many of his claims for injunctive relief.  The Complaint includes damages claims under the Equal Protection Clause and RFRA (Counts I and II, respectively), a claim for injunctive relief under the Privacy Act (Count III), and two FOIA counts (Counts IV and V).  The parties have agreed that the arguments in the instant motion may be applied to the Fourth Amended Complaint, provided that Defendants will have the opportunity to file a supplemental motion raising additional defenses particular to the Fourth Amended Complaint in the event the case is not dismissed in its entirety.  *See* Dkt. 117 at 2 n.1.

## II.  LEGAL STANDARDS

On a motion to dismiss for failure to state a claim, the Court must "treat the complaint's factual allegations as true [and] must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." *Gilvin v. Fire*, 259 F.3d 749, 756 (D.C. Cir. 2001).  Although "detailed factual allegations" are not necessary, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  The Court need not accept as true either a "legal conclusion couched as a factual allegation" or an inference drawn by the plaintiff if such inference is unsupported by the facts set out in the complaint. *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (citations and quotation marks omitted).  The Court may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (citation omitted).

If a Court concludes that it is appropriate to consider additional evidence submitted by the parties, it must convert the motion to dismiss into a motion for summary judgment.  Fed. R. Civ. P. 12(d).  Whether to convert a motion to dismiss into a summary judgment motion is "committed to the sound discretion of the trial court." *Bowe-Connor v. Shinseki*, 845 F. Supp. 2d 77, 85 (D.D.C. 2012) (quotation marks omitted).  Before deciding to convert a motion to dismiss, the "court must assure itself that summary judgment treatment would be fair to both parties," *Tele-Commc'ns of Key West, Inc. v. United States*, 757 F.2d 1330, 1334 (D.C. Cir. 1985), and that the parties are provided the opportunity to present all relevant materials, Fed. R. Civ. P. 12(d).

The Court may grant summary judgment where the evidence submitted by the parties shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The moving party bears the initial burden to identify the portions of the record that, in its view, "demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party carries that burden, the opposing party must "designate specific facts showing there is a genuine issue for trial."  *Id.* at 324 (quotation marks omitted).

## III.  DISCUSSION

### A.  Equal Protection

Plaintiff asserts his equal protection claim (Count I) against only Defendant Clark in his individual capacity.  Dkt 118 at 16.  At oral argument in this matter, however, the Court became aware that Clark had not yet been served.  Although counsel for the United States has advanced several arguments for dismissal of the equal protection claim, counsel has also expressly stated that he lacks authorization to represent Clark.  Plaintiff filed a proof of service on Clark after oral argument (Dkt. 125); however, there is no indication in the record that counsel for the United States has yet been authorized to represent him.

Because the only defendant against whom Plaintiff alleges his equal protection claim is not represented by any attorney who has appeared, it would be inappropriate for the Court to rule on the merits of the equal protection claim at this time.  After an attorney for Clark notices an appearance, Clark will have an opportunity to move to dismiss the equal protection claim against him and raise any appropriate arguments in support of that motion.

**B. RFRA**

Plaintiff's RFRA allegations focus on his treatment at CI Rivers and CI Big Spring, two private prisons at which he was incarcerated in 2009 and 2010, respectively. Dkt. 118 ¶¶ 90-91, 119, 121. At CI Rivers, Plaintiff, who is Muslim, alleges that he was not permitted to pray while on work duty, and that, as a result, he was unable to pray "at the times required by his religious beliefs." *Id.* ¶ 95. At CI Big Spring, Plaintiff alleges he was not provided halal meals and was prohibited from choosing kosher meals. *Id.* at 97. The alternative meals that were offered to Plaintiff allegedly contained ingredients that "would be inappropriate for an inmate following a halal diet." *Id.* ¶ 98. Plaintiff also alleges that, contrary to BOP policy, the company operating CI Big Spring failed to provide menus and nutritional information to inmates before meals. *Id.* ¶¶ 99-100. Finally, he alleges that he was not allowed to take all of his meals in the evening on days on which fasting was required outside of Ramadan. *Id.* ¶ 101. Plaintiff's allegations target Defendant Lappin, the former director of BOP, as well as three John Doe defendants who were allegedly responsible for enforcing BOP policy at CI Big Spring. *Id.* ¶¶ 16-17.

Defendants argue that these allegations fail to state a claim for three reasons. First, they assert that RFRA does not authorize damages actions against federal officials in their individual capacities. Second, they claim that Plaintiff has failed to allege sufficient personal involvement by Defendant Lappin for liability to attach to him. Finally, they argue that Plaintiff's allegations are substantively insufficient to state a claim under RFRA. The Court will consider each of these arguments in turn.

**1.  *Individual-Capacity Damages Claims Against Federal Officials***

The parties disagree on the issue whether RFRA authorizes individual-capacity damages claims against federal officials. RFRA allows any "person whose religious exercise has been burdened in violation of [the statute]" to "assert that violation as a claim or defense in a judicial

proceeding and obtain appropriate relief against a government."  42 U.S.C. § 2000bb-1(c).  A

"government" is defined to "include[] a branch, department, agency, instrumentality, and official

(or other person acting under color of law) of the United States."  42 U.S.C. § 2000bb-2(1).

Defendants argue that this definition does not authorize individual-capacity suits against

government officials.  They assert that the statute's use of the word "official" refers only to

official-capacity suits, and that the interpretive canons *noscitur a sociis* and *ejusdem generis*

show that the term "other person acting under color of law" should be read to authorize only

official-capacity claims.  Dkt. 98 at 6.

There are significant flaws in Defendants' position.  It is not at all clear why a statutory

term authorizing suit against "an official" should be presumed to allow only official-capacity

suits.  Courts routinely recognize that "'government officials may be sued in their individual

capacities'" under certain circumstances, *e.g.*, *Oberwetter v. Hilliard*, 639 F.3d 545, 554 (D.C.

Cir. 2011) (citation omitted)—indeed, "officials" are the only persons for whom the distinction

between individual-capacity and official-capacity suits has any salience.  A statutory term

authorizing suits against "officials" thus sheds little light on whether and when plaintiffs may sue

those officials in their individual capacities.

Defendants' argument that the phrase "other person acting under color of law" authorizes

only official-capacity suits is even less persuasive.  That phrase contemplates that persons

"other" than "officials" may be sued under RFRA, and persons who are not officials may be sued

only in their individual capacities.  *See Jama v. INS*, 343 F. Supp. 2d 338, 374 (D.N.J. 2004).

Defendants' interpretation would render the entire phrase surplusage: once Congress authorized

official-capacity suits against "officials," adding another term that allowed only official-capacity

suits would have had no effect whatsoever.  Neither of the interpretive canons on which

Defendants rely can overcome this deficiency in their reading of the statute.  Under the canon

*ejusdem generis*, "when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration." *Ali v. BOP*, 552 U.S. 214, 223 (2008) (quotation marks omitted).  This canon is inapplicable here.  The phrase "other person acting under color of law" appears in § 2000bb-2 not as a final, "catch-all" item in a list, but instead as a parenthetical modifier that expands upon one item on the list.  *See* 42 U.S.C. § 2000bb-2 ("the term 'government' includes a branch, department, agency, instrumentality, and *official (or other person acting under color of law)* of the United States . . . .") (emphasis added).  The phrase "official (or other person acting under color of law)" is thus very similar to the disjunctive phrase to which *ejusdem generis* was held inapplicable in *Ali*. 552 U.S. at 225 ("The structure of the phrase 'any officer of customs or excise or any other law enforcement officer' does not lend itself to application of the canon.").  The phrase at issue is intended to enlarge the category of "person[s]" subject to suit, not to refer to miscellaneous things that are "akin to" "branch[es], department[s], agenc[ies], instrumentalit[ies], and official[s]."

The argument under *noscitur a sociis* fares no better.  Under that precept, "a word may be known by the company it keeps." *Graham Cnty. Soil & Water Conserv. Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 288 (2010).  It is "'not an invariable rule,'" however, "'for the word may have a character of its own not to be submerged by its association.'" *Id.* (quoting *Russell Motor Car Co. v. United States*, 261 U.S. 514, 519 (1923)).  Here, that the phrase "or other person acting under the color of law" has a "character of its own" is evident on the face of the statute. There is no apparent congruity between a "branch, department, agency [or] instrumentality" of the government and a "person," and the statute expressly differentiates "officials" from "*other* person[s]."  By authorizing suits against "persons" who are not "officials," Congress thus envisioned at least some individual-capacity suits under RFRA.

7

The fact that Congress authorized individual-capacity suits against "other persons acting under color of law" at least suggests that it also intended to permit individual-capacity suits against "officials," but it does not conclusively resolve the issue.  Congress could have intended to permit only official-capacity suits against officials while allowing suits against non-officials "acting under color of law."  This reading of the statute, however, is implausible.  First, there is no affirmative evidence that Congress intended to draw such a distinction.  Given the availability of qualified immunity, it would be anomalous if actual government officials were wholly immune from personal liability for even clear RFRA violations while private citizens "acting under color of law" were subject to suit—and it would certainly do nothing to further RFRA's purpose of "provid[ing] a claim or defense to persons whose religious exercise is substantially burdened by government."  42 U.S.C. § 2000bb(b).

Second, similar statutory language in at least one other context has been interpreted to permit individual-capacity claims against officials.  42 U.S.C. § 1983 permits suits against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage" of a State or territory deprives a person of constitutional rights, and is uniformly interpreted to permit individual-capacity claims against government officials.  *See, e.g.*, *Wesby v. District of Columbia*, 765 F.3d 13, 18, 31 (D.C. Cir. 2014) (affirming judgment under § 1983 against police officers "in their individual capacities").  Under Defendants' interpretation of RFRA, Congress's choice explicitly to include "official[s]" among the persons and entities that may be sued under the statute—a departure from the language of § 1983—would impose an additional *limitation* on plaintiffs' ability to sue officials.  This is backwards: by explicitly adding a term permitting suits against officials to language familiar from the § 1983 context, RFRA contemplates, if anything, that such suits will be more available.  In any event, it is safe to assume that Congress understood that it acted against the backdrop of settled § 1983 precedent when it added the similar "under

8

color of law" language to RFRA.  *Cf. Lorillard v. Pons*, 434 U.S. 575, 581 (1978) ("where . . . Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute").

Defendants have marshalled only minimal case law supporting their position.  The two decisions from the Western District of Pennsylvania they cite do not analyze the relevant statutory provisions.  *Ellis v. United States*, No. 08-160, 2011 WL 3290217, at *12 (W.D. Pa. June 17, 2011), simply follows, without elaboration, *Jean-Pierre v. BOP*, No. 09-266, 2010 WL 3852338, at *6 n.4 (W.D. Pa. July 30, 2010).  *Jean-Pierre*, in turn, stated in a footnote without analysis that "neither RFRA nor RLUIPA [the Religious Land Use and Institutionalized Persons Act] support damages claims against government officials in their individual capacity."  The cases it cites for that proposition, moreover, uniformly involve RLUIPA, not RFRA.  *See Nelson v. Miller*, 570 F.3d 868, 889 (7th Cir. 2009) ("declin[ing] to read RLUIPA as allowing damages against defendants in their individual capacities"); *Rendelman v. Rouse*, 569 F.3d 182, 189 (4th Cir. 2009) ("Congress did not signal with sufficient clarity an intent to subject [a state official] to an individual capacity damages claim under RLUIPA"); *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 329 (5th Cir. 2009) ("we decline to read Congress's permission to seek 'appropriate relief against a government' as permitting suits against RLUIPA defendants in their individual capacities"), *aff'd sub nom. Sossamon v. Texas*, 131 S. Ct. 1651 (2011); *Smith v. Allen*, 502 F.3d 1255, 1275 (11th Cir. 2007) ("section 3 of RLUIPA . . . cannot be construed as creating a private right of action against individual defendants for monetary damages"); *Porter v. Beard*, No. 09-549, 2010 WL 2573878, at *6 (W.D. Pa. May 12, 2010) ("[RLUIPA] does not support damages claims against state officials in their individual capacity"); *Logan v. Lockett*, No. 07-

9

1759, 2009 WL 799749, at *4 (W.D. Pa. Mar. 25, 2009) ("RLUIPA does not support damage claims against state officials in their individual capacity").

The distinction between RFRA and RLUIPA is essential to the question raised here. Although RFRA by its terms authorizes lawsuits against both the federal government and the states, it was held unconstitutional as applied to the states in *City of Boerne v. Flores*, 521 U.S. 507, 536 (1997) (holding that application of RFRA to states exceeded Congress's power under the Enforcement Clause of the Fourteenth Amendment). In response, Congress enacted RLUIPA as an exercise of its spending power. *See Sossamon v. Texas*, 131 S. Ct. 1651, 1656 (2011).

Although "RLUIPA borrows important elements from RFRA," including virtually identical language creating a private right of action for aggrieved individuals, *id.*, the distinct constitutional bases for the two laws affect their breadth. In particular, because RLUIPA was enacted as an exercise of Congress's spending power, interpreting that statute to allow damages actions against state officials in their individual capacities would "raise serious questions regarding whether Congress had exceeded its [constitutional] authority." *Nelson*, 570 F.3d at 889. Restrictions imposed on states pursuant to the Spending Clause are essentially contractual in nature—states agree to comply with certain conditions in exchange for federal funds. *See id.* at 887-88. Applying restrictions created pursuant to the Spending Clause to persons or entities other than the recipients of the federal funds at issue would have the effect of binding non-parties to the terms of the spending "contract." *Id.* (citing *Sossamon*, 560 F.3d at 328-29; *Smith v. Allen*, 502 F.3d 1255, 1275 (11th Cir. 2007)). Courts have thus declined to allow individual-capacity suits for damages against state officials under RLUIPA because doing so would subject those officials to Spending Clause restrictions that are properly binding only on states that receive federal funds. *See, e.g.*, *Nelson*, 570 F.3d at 889; *Smith*, 502 F.3d at 1274-75. Other courts have reached the same conclusion for the related reason that RLUIPA does not "signal with sufficient

10

clarity an intent to subject" state officials to individual capacity suits, applying a "clear notice requirement" that is specific to Spending Clause enactments. *Rendelman*, 589 F.3d at 188-89; *see also Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) ("if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously").

Neither of these rationales applies to interpretation of RFRA.  RFRA's application to federal action is not based on the Spending Clause.  Rather, Congress may "carve out a religious exemption from otherwise neutral, generally applicable laws based on its power to enact the underlying statute in the first place." *Guam v. Guerrero*, 290 F.3d 1210, 1220-21 (9th Cir. 2002).  There can be no question, moreover, that Congress possesses the power "to establish and maintain an effective regime of criminal law enforcement," including the power to control "the operation of federal correctional facilities."  Constitutionality of 18 U.S.C. § 1120, 24 Op. O.L.C. 156, 158, 2000 WL 34475733 (2000).  This Article I power carries with it the authority to require religious accommodation of federal inmates pursuant to RFRA.  *See Kikumura v. Hurley*, 242 F.3d 950, 959 (10th Cir. 2001); *Guerrero*, 290 F.3d at 1221.

Because Congress can create a right of action against an individual to enforce such statutory requirements, it need not satisfy the "clear notice" requirement that attaches to conditions imposed under the Spending Clause.  And, as the Seventh Circuit recognized in *Nelson*, the language of RLUIPA (which closely tracks the relevant language of RFRA) "appears to authorize suit against [a defendant official] in his individual capacity."  570 F.3d at 886.  In *Nelson*, that apparent meaning was overcome only by the specific constitutional concerns raised by the Spending Clause.  Construing RFRA, where those concerns do not apply, the Court concludes that Congress intended to authorize both official and individual-capacity suits against federal officials.

It follows from this conclusion that Congress also intended to permit individual capacity

suits *for damages*.  It is unlikely that an action for injunctive or declaratory relief under RFRA

would be treated as an individual-capacity suit.  "Regardless of the manner by which a plaintiff

designated the action, a suit should be regarded as an official-capacity suit when the judgment

sought would expend itself on the public treasury or domain, or interfere with the public

administration, or if the effect of the judgment would be to restrain the Government from acting,

or compel it to act."  *Hatfill v. Gonzales*, 519 F. Supp. 2d 13, 24 (D.D.C. 2007) (citing *Dugan v.

Rank*, 372 U.S. 609, 620 (1963)) (quotation marks and alterations omitted).  All or nearly all

RFRA claims for injunctive or declaratory relief against federal officials would likely satisfy

those criteria.  The only significant purpose for an individual-capacity claim, then, would be to

seek damages—damages that are unavailable in RFRA actions against the sovereign.  *See

Webman v. BOP*, 441 F.3d 1022, 1025-26 (holding that RFRA does not waive federal

government's sovereign immunity from suits for damages).

The language of the statute substantiates this inference.  Faced with "the question of what

remedies are available under a statute that provides a private right of action," courts "presume

the availability of all appropriate remedies"—including, at least at times, damages—"unless

Congress has expressly indicated otherwise."  *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60,

66, 76 (1992) (holding that "a damages remedy is available for an action brought to enforce Title

IX" of the Civil Rights Act).  RFRA expressly allows plaintiffs to "obtain appropriate relief

against a government," and contains no "express[ ] indicat[ion]" that damages are prohibited.  42

U.S.C. § 2000bb-1(c); *Franklin*, 503 U.S. at 66.  Thus, under the presumption articulated in

*Franklin*, RFRA authorizes damages when that form of relief is "appropriate."[1]

---

[1]  A thorough opinion from the District of New Jersey reached the same conclusion even though
it concluded that the presumption in *Franklin* was inapplicable to RFRA.  *See Jama*, 343 F.

The Court of Appeals' conclusion in *Webman* that damages are unavailable in RFRA suits against the government does not detract from this conclusion. That decision turned on the principle that "courts must 'strictly construe' any waiver of sovereign immunity," allowing relief against the government only when its authorization is "'unequivocal.'" *Webman*, 441 F.3d at 1025-26 (alterations omitted) (quoting *Lane v. Peña*, 518 U.S. 187, 192, 198 (1996)). But Congress need not waive sovereign immunity to permit an individual-capacity suit against a federal official. *See Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 686-87 (1949). And a reading RFRA that allows damages claims against officials in their individual capacities but not against the federal government itself is not at all self-contradictory. Because Congress did not expressly waive sovereign immunity from suits for damages, damages are not an "appropriate" remedy against the government itself. *See Webman*, 441 F.3d at 1028 (Tatel, J., concurring) ("RFRA nowhere makes clear that damages are 'appropriate' (at least against the government[)]") (emphasis added). But because it did not expressly prohibit suits for damages, they may be an "appropriate" remedy against individual-capacity defendants.

---

Supp. 2d at 375-76. There, the court reasoned that a damages remedy was available in individual-capacity suits under RFRA because it is plausible that Congress intended that remedy to be available, prohibiting damages would conflict with the purpose of RFRA, and other courts have assumed that damages are available under the statute. *Id.* at 374-75. The Court agrees with this analysis, which further supports the conclusion that damages are available.

The *Jama* court also concluded, however, that because RFRA expressly authorizes "appropriate relief against a government," the statute is not "silent" on the issue of remedies and the presumption in *Franklin* is inapplicable. 343 F. Supp. 2d at 376. This reading of *Franklin* is too narrow. The presumption in that case obviously does apply where Congress is entirely silent on the issue of remedies. But it is also clear that the mere mention of remedies does not rebut the presumption—instead, the presumption applies unless "Congress has expressly indicated" that a remedy is unavailable. *Franklin*, 503 U.S. at 66. RFRA provides only that a plaintiff may obtain "appropriate relief." 42 U.S.C. § 2000bb-1(c). This language does nothing more than authorize what courts applying *Franklin* presume, and it falls far short of an "express[ ] indicat[ion]" that damages are prohibited.

### 2.   *Defendant Lappin's Personal Involvement*

Defendants also contend that Harley Lappin—the former director of BOP—was not personally involved in any of the deprivations of religious liberty that Plaintiff asserts, and that he therefore cannot be liable under RFRA.  The first step in their argument is the claim that individual-capacity suits under RFRA are "in essence . . . Free Exercise Clause *Bivens* claim[s], which courts dismiss when based on *respondeat superior* liability."  Dkt. 98 at 8.  If RFRA follows *Bivens* in this respect, then Plaintiff would have to allege that Defendant Lappin was directly, rather than vicariously, liable for the RFRA violations Plaintiff asserts.  According to Defendants, Plaintiff has failed to do so.

Plaintiff disagrees with both of these contentions.  He argues that the relief available under RFRA should be "broadly construed to incorporate well-settled theories of vicarious liability under the common law against which Congress legislated."  Dkt. 100 at 11.  But even if the limitations developed in *Bivens* actions apply to RFRA, Plaintiff argues that he has sufficiently alleged Defendant Lappin's personal involvement in the asserted violations.  In particular, he points to the allegation in the Complaint that Defendant Lappin "refus[ed] to require private entities [that operated contract prisons] to follow BOP regulations" that protect inmates' religious exercise.  Dkt. 118 ¶ 131.

The parties have identified only minimal authority addressing the viability of vicarious liability theories under RFRA.  Defendants point to two cases in which RFRA counts were dismissed for failure to allege personal involvement of the individual defendants.  *See* Dkt. 98 at 8-9 (citing *Curry v. Gonzales*, No. 07-0199, 2007 WL 3275298, at *1 (D.D.C. Nov. 6, 2007) and *White v. Sherrod*, No. 07-821, 2009 WL 196332, at *1 (S.D. Ill. Jan. 28, 2009)).  In *Curry*, the court considered the plaintiff's RFRA count alongside his *Bivens* claim and dismissed both for failure to allege the individual defendant's personal involvement.  2007 WL 3275298, at *1.  It

14

did not provide any discussion of the issue raised here.   In *White*, the court dismissed a RFRA claim for failure to allege that the named defendant was personally involved in the alleged deprivation of religious freedom at issue, but it seems not to have separately considered the question whether the plaintiff could rely on a vicarious liability theory.  2009 WL 196332, at *2. Thus, neither of the cases cited by Defendants provides substantial guidance.

Plaintiff does only somewhat better.  He relies on *Pineda-Morales v. De Rosa*, No. 03-4297, 2005 WL 1607276 (D.N.J. July 6, 2005), which declined to dismiss a RFRA count predicated on a *respondeat superior* theory simply because the defendants had "present[ed] no reason why such liability should not attach under a RFRA claim."  *Id.* at *5 n.5.  That conclusion is of little assistance here.  He also cites *Agarwal v. Briley*, No. 02-6807, 2004 WL 1977581, at *14 (N.D. Ill. Aug. 25, 2015), in which a court declined to enter judgement for the defendant on a vicarious liability claim under RLUIPA.   The plaintiff in that case was an inmate who filed a grievance requesting vegetarian meals, which he asserted were required by his Hindu faith.  *Id.* at *10.  A subordinate prison official to whom the warden had delegated responsibility for non-emergency inmate grievances denied the request.  *Id.*  Even though the warden himself had not been involved in the decision to deny the plaintiff vegetarian meals—indeed, the warden remained unaware of the request until the plaintiff filed suit, *id.*—the court concluded that he could be held liable under RLUIPA.  It reasoned that RLUIPA does not incorporate the strict rule against supervisory liability applied in § 1983 actions, noting that RLUIPA (like RFRA) comprehends actions against governmental entities as well as persons.  *Id.* at *14.  The *Agarwal* court did not decide, however, whether pure vicarious liability is actionable under RLUIPA.  It found only that the warden had "deliberate[ly] avoid[ed] any involvement in review of Plaintiff's grievance," and that this fact established "sufficient 'fault,' an adequate causal nexus to Plaintiff's injury, to support a finding of liability."  *Id.*  *Agarwal* thus, at most, stands for the

proposition that "negligent supervision" might be actionable under RLUIPA, not that a supervisor may be held liable for the acts of his subordinates without any independent showing of fault. *Id.*; *see Palermo v. Libby*, No. 11-557, 2012 WL 4929423 (D.N.H. Sept. 12, 2012) (distinguishing *Agarwal* and dismissing RLUIPA claim where plaintiff "made no allegation concerning an act or failure to act by [the defendant] that caused or failed to prevent any of the violations alleged").

The Court concludes that pure vicarious liability—that is, liability of supervisors based solely on the acts of their subordinates—is not sufficient to state a claim under RFRA. Neither party has directed the Court to any case expressly endorsing such a theory, and the Court has identified none. Plaintiff's arguments based on the structure and purpose of RFRA, particularly absent any direct support in the case law, are not compelling. Plaintiff assumes that RFRA was enacted against a background of "traditional common-law principles" embodied in state tort law, Dkt. 100 at 11-12, but cites no legislative history or other evidence suggesting this was so. Instead, it appears more likely that Congress legislated in relevant respects against the more relevant background of constitutional litigation under *Bivens* and § 1983. Free exercise claims before RFRA would have been brought under these theories, not the common law, and there is no indication in the statute that Congress intended to adopt common-law theories of liability that had previously been unavailable to plaintiffs. It is true that Congress expressly authorized suits against government "branch[es], department[s], [and] agenc[ies]"—entities that cannot act personally in a manner that would subject them to liability under *Bivens*. 48 U.S.C. 2000bb-2(1). But Congress did this expressly. RFRA does not by its terms authorize a further step away from the background of § 1983 and *Bivens* precedents to impose vicarious liability, and nothing before the Court on this motion suggests that it intended to do so implicitly.

When RFRA was enacted in 1993, *see* Pub. L. 103-141 (1993), the leading Supreme Court case addressing supervisory liability under § 1983 and *Bivens* was *Rizzo v. Good*, 423 U.S. 362 (1976).  The Court in *Rizzo* vacated an injunction against municipal officers for failure to supervise the activities of a local police force, requiring the plaintiff to prove an "affirmative link between the occurrence of the various incidents of police misconduct [at issue in the case] and the adoption of any plan or policy by the petitioners . . . showing their authorization or approval of such misconduct."  *Id.* at 371.  The Court of Appeals for this Circuit "join[ed] the majority of courts" after *Rizzo* "calling for something more than mere negligence to forge the 'affirmative link' between the constitutional infringement and the supervisor's conduct."  *Haynesworth v. Miller*, 820 F.2d 1245, 1261 (D.C. Cir. 1987), *abrogated in part on other grounds*, *Hartman v. Moore*, 547 U.S. 250, 266 (2006) (holding that plaintiffs must present evidence of lack of probable cause in retaliatory prosecution suits under § 1983 and *Bivens*).  Under that standard, a plaintiff must show that "absent effective supervision, harm was not merely foreseeable, but was highly likely, given the circumstances of the case"—so likely that "it can be said that the supervisor acquiesced in the resulting constitutional violation."  *Haynesworth*, 820 F.2d at 1261.  Because this showing—or a similar one, *see id.* at 1261 n.126—was widely required in *Bivens* and § 1983 actions at the time RFRA was enacted, the Court concludes that it reflects the background state of the law against which Congress legislated.  Thus, to assert a claim for supervisory liability under RFRA, Plaintiff must allege that Defendant Lappin's failure to supervise his subordinates was "highly likely, given the circumstances of the case" to give rise to a constitutional violation.

Plaintiff contends that his allegations satisfy this standard.  His complaint alleges that Defendant Lappin, along with the John Doe defendants, "refus[ed] to require private entities [that operated private prisons] to follow BOP regulations" and therefore "set in motion the

conditions that led to the violation of Mr. Patel's religious rights." Dkt. 118 ¶ 131. In addition, Plaintiff directs the Court to two BOP policy statements (including one signed by Defendant Lappin, *see* Dkt. 100-3 at 23) that include significant protections for inmates' religious freedom. Dkt. 100-2; Dkt. 100-3. These policies could suggest that Defendant Lappin was aware that BOP personnel required specific oversight and guidance if they were to avoid infringing on inmates' religious liberty, and that it was thus "highly likely" that failure to provide similar oversight and guidance to private prisons would cause RFRA violations like the ones Plaintiff alleges here.

Plaintiff's argument fails to take into account, however, that BOP *did* maintain a policy requiring private prisons to comply with RFRA. In their Statement of Undisputed Facts, Defendants asserted that "The BOP specifically requires private facilities to comply with [RFRA], and to ensure the religious services programs are consistent with this Act." Dkt. 68-2 ¶ 25. Plaintiff admitted this fact, although he disputed "that BOP has ensured that Rivers comply with RFRA." Dkt. 72-1 at 7 (Defendant's Statement of Genuine Issues). Here is the problem: the only act that the Complaint alleges Defendant Lappin did that could potentially expose him to supervisory liability under *Rizzo* and *Haynesworth* is his promulgation of a policy requiring that BOP facilities take steps to comply with RFRA. Had he done that while leaving private prisons free, as a matter of policy, to violate RFRA, his failure to provide a policy might suffice to link him to the harms Plaintiff alleges. But the undisputed evidence shows that BOP "specifically require[d]" compliance with RFRA in both agency-operated and private facilities. Dkt. 68-2 ¶ 25. There is no showing that differences in policy caused Plaintiff's harm. If, on the other hand, differences in *enforcement* were the cause of that harm, Plaintiff has not alleged that Defendant Lappin was personally involved in enforcement of BOP policies such as the ones at

issue, much less that it was "highly likely" that any deficiency in his personal oversight of policy enforcement would give rise to the harm he alleges.

Finding Defendant Lappin liable under these circumstances would appear to authorize individual-capacity claims for damages against the BOP director for virtually any RFRA violation—if a violation occurred and BOP policies require compliance with RFRA, the BOP director failed to ensure that the agency's policies were enforced. But that line of reasoning, based not on evidence of the defendant's personal acts but instead on inferences about nothing more than his position, *see* Dkt. 118 ¶ 132, would create precisely the sort of vicarious liability that the Court has concluded RFRA does not provide. The evidence and the allegations in this matter show that Defendant Lappin was personally responsible for (at most) BOP's relevant policies, and that BOP's relevant policies prohibited RFRA violations in the prisons in which Plaintiff asserts they took place. Plaintiff has therefore failed to come forward with evidence of any personal involvement by Defendant Lappin in the RFRA violations he alleges, and Defendant Lappin is entitled to summary judgment on this claim.[2]

### 3. *Sufficiency of Plaintiff's Allegations under* **Twombly** *and* **Iqbal**

Because Defendant Lappin is entitled to summary judgment on Plaintiff's RFRA count, the Court need not consider his argument that Plaintiff's allegations are insufficient to state a claim under RFRA. If and when Plaintiff serves the Doe defendants—who are not presently participating in this action—those defendants will be afforded an opportunity to request that the

---

[2] The Court concludes that it is appropriate to treat BOP's motion as a motion for summary judgment with respect to this claim. Although Plaintiff, in his opposition to BOP's motion, requested an opportunity for discovery in the event the Court treats the motion as one for summary judgment, that request sought information to "test the accuracy of Defendants' testimony about the purported rational basis for their . . . policies" and did not concern Plaintiff's RFRA claim. Dkt. 72 at 44.

Court reconsider Chief Judge Roberts's conclusion that Plaintiff has sufficiently pleaded substantive RFRA violations. *See* Dkt. 90 at 4-7.

## C.  The Privacy Act

Plaintiff also alleges that the Bureau of Prisons has violated his rights under the Privacy Act, 5 U.S.C. § 552a.  Plaintiff asserts that while he was incarcerated at FCI Big Spring in 2004, he wrote a letter to the *Dallas Morning News* in which he claimed that a fellow inmate, David Duke, was receiving preferential treatment from BOP staff as a result of his "notoriety."  Dkt. 118 ¶¶ 82, 140.  According to Plaintiff, prison officials improperly opened and read Plaintiff's letter; they then wrote a memorandum that documented the event and recommended that Plaintiff be transferred to a different facility.  *Id.* ¶ 144.  Plaintiff contends that BOP retains this memorandum in its files, and that doing so violates the Privacy Act's prohibition against maintaining records "'describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of authorized law enforcement activity.'" *Id.* ¶ 146 (quoting 5 U.S.C. § 522a(e)(7)).

BOP moves to dismiss this count on three grounds.  First, it argues that the memorandum at issue falls under the "authorized law enforcement activity" exception to the Privacy Act.  Dkt. 68-1 at 28-29.  Next, it contends that Plaintiff's Privacy Act claim is barred by the doctrine of *res judicata*, based on Plaintiff's effort to litigate the issue in a prior action.  *Id.* at 29-30.  Finally, it argues that the Privacy Act claim is barred by the Act's two-year statute of limitations because Plaintiff has known of the existence of the memorandum at issue since at least 2006.  *Id.* at 30-31.  None of these arguments is persuasive.

**1.** ***The Law Enforcement Activity Exception***

As the Court of Appeals has noted, although the phrase "law enforcement activity" may "summon[ ] up images of criminal law, the legislative history of the provision makes it clear that it does not have that meaning here." *Nagel v. Dep't of Health, Educ. & Welfare*, 725 F.2d 1438, 1441 n.3 (D.C. Cir. 1984). Rather, the phrase is "liberally" construed, *Maydak v. United States*, 363 F.3d 512, 517 (D.C. Cir. 2004), to include "an authorized criminal investigation or . . . and authorized intelligence or administrative one," *Nagel*, 725 F.2d at 1441 n.3 (quotation marks omitted). In addition, it applies to "[a]n employer's determination whether an employee is performing his job adequately," *id.* at 1441, to an employer's evaluating or disciplining an employee, *id.*, and to BOP activity directed at maintaining "prison security," *Maydak*, 363 F.3d at 517.

In *Maydak*, the Court of Appeals concluded that declarations submitted by prison officials were sufficient to demonstrate that "examining photographs [of inmates arguably exercising First Amendment rights] for conduct that may threaten [prison] security is pertinent to and within the scope of the authorized law enforcement activity." *Id.* The Court also noted, however, that certain of the declarations in that case raised questions about other uses of the photographs, including what the declarants meant by terms such as "investigative or informative value." *Id.* As a result, the Court remanded the case to the district court to determine the nature of the use of the photographs on a more complete record.

*Maydak* is dispositive of BOP's argument at this stage of the litigation. BOP notes, for example, that a memorandum "pertaining [to] the prison staff's treatment of inmates *would* fall under this exception." Dkt. 68-1 at 28-29 (emphasis added). But BOP has not submitted any evidence regarding how the alleged memorandum was *actually* prepared, maintained, or used.

Under these circumstances, the Court concludes that Defendants cannot, on the present record, rely upon the law enforcement exception to avoid Plaintiff's Privacy Act claim.

## 2. Res Judicata

BOP next argues that Plaintiff's claim under the Privacy Act is *res judicata*. To establish that his claim is precluded under this doctrine, BOP must show that Plaintiff previously brought suit against the same defendant based on the same cause of action, and that that suit resulted in a final judgment on the merits of the claim he raises here. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n.5 (1979) ("Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action."); *Apotex, Inc. v. FDA*, 393 F.3d 210, 217 (D.C. Cir. 2004).

The factual basis for this contention is a matter of public record. In 2004, Plaintiff brought a lawsuit in this Court that included a Privacy Act claim relating to the memorandum at issue here. *Patel v. United States*, No. 08-1168-D, 2009 WL 1377530, at *6 (W.D. Okla. May 14, 2009). The action was promptly transferred to the Eastern District of Arkansas, where the district court dismissed Plaintiff's Privacy Act claim without prejudice for failure to exhaust administrative remedies. *Id.* at *4-5. The action was subsequently transferred to the Eastern District of North Carolina and then to the Western District of Oklahoma, where Plaintiff moved for reconsideration of the Eastern District of Arkansas's dismissal of his Privacy Act claim. *Id.* at *1. The court rejected that motion, holding that Plaintiff had not shown clear error or any change in legal or factual circumstances that would justify reconsideration of the prior dismissal. The court also noted that it was "particularly reluctant to reinstate a Privacy Act claim that was dismissed without prejudice" because Plaintiff had several years in which he "could have brought a separate action and presented his additional proof of exhaustion." *Id.* at 5. In the court's view, it was "inconsistent with Congress'[s] purpose in providing civil remedies under

the Privacy Act to permit an individual to bring a private action years later under these

circumstances." *Id.* The Tenth Circuit affirmed the "dismissal without prejudice." *Patel v.*

*United States*, 399 Fed. App'x 355, 361 (10th Cir. 2010).

There was no "judgment on the merits" of Plaintiff's Privacy Act claim in the prior

litigation. As the district court in Oklahoma observed, and the Tenth Circuit explicitly affirmed,

Plaintiff's claim was dismissed "without prejudice" because he had not exhausted administrative

remedies by petitioning BOP to remove the memorandum at issue from its files. *Id.*; *Patel*, 2009

WL 1377530, at *5. The Western District of Oklahoma's refusal to reconsider that decision did

nothing to change the decision of the transferor court—indeed, the Western District of Oklahoma

recognized that, because the earlier dismissal had been without prejudice, Plaintiff could have

simply exhausted his administrative remedies and brought a new action. BOP relies on the

language in that court's decision suggesting that the court believed Plaintiff had been dilatory in

pursuing his claim, but fails to explain how that statement could have transformed the Western

District of Oklahoma's decision declining to reconsider the decision of the transferor court into a

decision that actually changed the earlier dismissal "without prejudice" into a disposition on the

merits. Because Plaintiff's Privacy Act claim has never been adjudicated on the merits, the

doctrine of *res judicata* does not bar him from asserting it in this action.

### 3. *The Statute of Limitations*

BOP's final argument is that Plaintiff's Privacy Act claim is barred by the applicable

statute of limitations. Absent material and willful misrepresentation on the part of an agency,

any "action to enforce any liability created under" the Privacy Act must be brought "within two

years from the date on which the cause of action arises." 5 U.S.C. § 522a(g)(5). BOP argues

that because Plaintiff "knew of the existence of the memorandum" at issue by February 9, 2006

at the latest, the statute of limitations began running on that date and expired on February 9,

2008—more than one year before he first alleged his Privacy Act claim in this action.  Dkt. 68-1 at 31.

BOP misreads the statute.  The Privacy Act allows a suit to be brought "[w]henever any agency makes a determination . . . not to amend an individual's record in accordance with his request."  5 U.S.C. § 522a(g)(1)(A).  Plaintiff alleges that he petitioned BOP to amend his record on February 20, 2009 and that his request was denied on April 30, 2009—this denial triggered his right to bring suit.  BOP has identified no case law or other authority for the counterintuitive proposition that a Privacy Act plaintiff's "cause of action arises" before the plaintiff can bring a suit.  Indeed, BOP itself notes that "[t]he statute of limitations [under the Privacy Act] 'commences at the time that a person knows or has reason to know that his request had been denied.'"  Dkt. 76 at 13 (quoting *Englerius v. Veterans Admin.*, 837 F.2d 895, 897 (9th Cir. 1988)).

In its reply, BOP asserts for the first time that Plaintiff in fact "was . . . aware that his request for an amendment had been denied" in 2006.  Dkt. 76 at 14.  Although BOP does not explain this assertion or cite to the record, it appears that the agency is referring to the fact that Plaintiff submitted documents to the Arkansas and Oklahoma district courts that, in Plaintiff's view at the time, established that in 2004 he had requested relief from BOP under the Privacy Act and that his request had been denied.  These documents formed the basis for Plaintiff's requests for reconsideration of the order dismissing his Privacy Act claim.  *See Patel v. United States*, No. 08-cv-1168 (W.D. Okla. 2009), Dkt. 269; *Patel v. United States*, No. 04-cv-00771 (E.D. Ark. 2006) Dkt. 77.

The Court need not independently determine whether these documents in fact show that Plaintiff adequately requested and was denied the relief he seeks here, however, because the United States has previously taken the position that they do not.  *See* Response to Plaintiff's

Motion to Reconsider, *Patel v. United States*, No. 04-cv-00771 (E.D. Ark. 2006) Dkt. 78 ("It is

clear that the remedy [request] submitted by the Plaintiff in support of his Motion to Reconsider

addresses not the maintaining of a memo, but rather the opening of special mail and reading

same outside of Plaintiff's presence."). The district court denied Plaintiff's motion. Having

argued successfully to another district court that Plaintiff's 2004 request was insufficient to give

rise to a right to sue, BOP cannot now assert the opposite position in order to defeat Plaintiff's

claim on timeliness grounds. *See, e.g.*, *Comcast Corp. v. FCC*, 600 F.3d 642, 647 (D.C. Cir.

2010) ("Courts may invoke judicial estoppel where a party assumes a certain position in a legal

proceeding, succeeds in maintaining that position, and then, simply because his interests have

changed, assumes a contrary position.") (quotation marks and alterations omitted). And even if

BOP were not estopped from arguing that a claim had accrued based on Patel's 2004 request and

the Court concluded that one had, it is not clear that that fact would bar the subsequent accrual of

a new claim based on BOP's denial of the 2009 request. The Privacy Act states that an

"individual may bring a civil action"  "whenever any agency . . . makes a determination . . . not

to amend [the] individual's record in accordance with his request." 5 U.S.C. § 522a(g)(1).

There is thus no explicit statutory bar to a Privacy Act claim predicated on a duplicative request

to amend records, and BOP has not identified case law inferring that such a bar exists.

 BOP argues that allowing suits, like this one, triggered by the denial of Privacy Act

requests that had previously been submitted would allow "an individual . . . to maintain a Privacy

Act amendment claim in perpetuity as long as he continued to submit requests for amendment

and to receive adverse agency determinations." Dkt. 76 at 14. This argument is not persuasive.

*Res judicata* and collateral estoppel prevent a plaintiff from pursuing successive lawsuits based

on identical Privacy Act requests after an adverse judgment on the merits—there is no specter of

never ending litigation. BOP's real objection is to the fact that a plaintiff who knows of the

existence of a record that allegedly violates the Privacy Act may wait as long as he pleases

before requesting that the agency amend the record—or make repeated requests to the agency—

without jeopardizing his right to judicial review.  But there is nothing absurd about this result,

which, in any event, follows directly from the statutory language.  A request for amendment

under the Privacy Act seeks prospective relief to remedy the government's ongoing maintenance

of an improper or incorrect record.  *See* 5 U.S.C. 552a(d)(2)(B); 5 U.S.C. § 552a(g)(2)(A) (in

suit seeking review of denial of amendment, "the court may order the agency to amend the

individual's record in accordance with his request or in any such other way as the court may

direct").  As long as such an injury is ongoing, there is no reason that a plaintiff seeking relief

from it should be categorically barred from doing so simply because he could have sought relief

earlier.[3]

Because BOP's denial of Plaintiff's 2009 request to amend gave rise to a claim under the

Privacy Act, Plaintiff's claim is timely.

## D.  FOIA Claims

BOP also moves for summary judgment on Plaintiff's FOIA claims.  When a plaintiff

alleges that an agency has improperly withheld records, the reviewing court must "determine the

matter de novo." 5 U.S.C. § 552(a)(4)(B).  FOIA cases are typically resolved on motions for

summary judgment, which require that the moving party demonstrate that there are no genuine

issues of material fact and he or she is entitled to judgment as a matter of law.  *See Celotex*, 477

---

[3]  It is possible that laches might apply to bar suits where, for example, a Privacy Act plaintiff's
delay in requesting amendment has allowed the loss of evidence necessary to establish an
exemption.  *See generally Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962 (2014)
(considering applicability of laches to suit under the Copyright Act).  The Court need not decide
whether laches or a similar doctrine can apply under the Privacy Act, however, because BOP has
not argued or presented evidence showing that it would be entitled to relief under any such
doctrine.

U.S. at 325; *Beltranena v. U.S. Dep't of State*, 821 F. Supp. 2d 167, 175 (D.D.C. 2011) (noting that FOIA cases are "frequently" decided on motions for summary judgment).  To meet its burden, the government must generally submit "relatively detailed and non-conclusory" affidavits or declarations establishing the adequacy of its search for responsive documents, *SafeCard Servs. Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991), and an index of the information withheld, *see Vaughn v. Rosen*, 484 F.2d 820, 827-28 (D.C. Cir. 1973); *Summers*, 140 F.3d at 1080 (explaining that to carry its burden, agency that declines to produce a requested document "must submit a *Vaughn* index to explain why it has withheld information").  Affidavits provided by an agency are "accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents."  *Safecard Servs.*, 926 F.2d at 1200 (quotation marks omitted).

1.  ***Documents Related to Office of Inspector General Report***

Plaintiff's first FOIA claim arises from a 2004 request that he characterizes as seeking "documents related to a [Justice Department Office of the Inspector General ('OIG')] report." Dkt. 118 ¶ 152.  Plaintiff actually filed this request with the OIG; when OIG determined that 21 pages of the records it identified as responsive "originated with" BOP, it referred those documents to BOP to be reviewed and, if appropriate, released.  Dkt. 68-6 ¶ 4 & Exh. A.

Plaintiff alleges that he received all 21 pages of the materials, although six pages contained redactions.  Dkt. 118 ¶ 153.  He objects, however, that "[n]one of the exhibits or witness interviews associated with the OIG report . . . were provided, nor was any reason provided for their withholding."  *Id.*  BOP's response is simple and compelling: the agency's responsibility was limited to reviewing and releasing the documents that were referred to it.  Dkt. 68-1 at 32.  BOP had no obligation to search for or to provide additional information in response to Plaintiff's 2004 FOIA request to OIG.

If the 2004 request to OIG were the only one at issue in this count, BOP would be entitled to summary judgment.  Plaintiff also alleges, however, that he filed three "similar requests with the BOP" in 2005.  These requests are not clearly identified in the Complaint, but in his opposition to Defendants' motion (Dkt. 72 at 36-37), Plaintiff focuses on a March 24, 2005, letter to Plaintiff quoting the contents of his requests (Dkt. 68-6, Exh. G).  Among other things, Plaintiff sought "[a]ll notes, memoranda, investigative documents, etc. created since September 1, 2003 and ending on February 1, 2004 pertaining to an investigation conducted into [Plaintiff's] alleged misconduct and placement in the SHU at FCI Big Spring, Texas."  *Id.*  BOP's declaration states that in responding to these requests the agency produced seven complete pages and three redacted pages to Plaintiff.  Dkt. 68-6 ¶ 13.

Plaintiff contends, however, that BOP's search must have been inadequate because the agency did not provide any of the exhibits to the OIG report—exhibits that, in Plaintiff's view, would have been responsive to his request.  Dkt. 72 at 37.  For example, Plaintiff contends that "the OIG reviewed photographs, a medical assessment, memoranda, reports, and other documents regarding Mr. Patel's injuries . . . sustained in an assault at FCI Big Spring," and he cites particular exhibits to the OIG report that he believes were likely responsive to his 2005 FOIA requests.  *Id.* at 37-38.  It is not clear whether the exhibits Plaintiff identifies are indeed responsive.  He refers to a document titled "Inmate Injury Assessment and Follow-Up for Kamal Patel," for example, and to a "SENTRY printout regarding Inmate Profile and Security/Designation for inmate Patel."  *Id.*  Either of those documents *might* be "notes, memoranda, investigative documents, etc. . . . pertaining to an investigation conducted into [Plaintiff's] alleged misconduct and placement in the SHU at FCI Big Spring," but Plaintiff has presented no further evidence demonstrating that they actually are.  The other document he refers to that "pertain[s] directly to Mr. Patel"—a "Letter Dated November 15, 2005, from Assistant

28

United States Attorney Robert McRoberts to Inmate Patel"—post-dates BOP's response to his

2005 FOIA requests.  Dkt. 72 at 38; *see* Dkt. 68-6 Exh. G.  Plaintiff cites other exhibits to the

OIG report that "appear to be responsive as well," including three affidavits, with the affiants'

names redacted (dated January 15, 2004), "Photographs documenting inmate Kamal Patel's

injuries," additional "SENTRY printout[s]," a memo "regarding BOP OIA interview" of a

person, and an incident report regarding an assault on Plaintiff.  Dkt. 72 at 38 n.20; see Dkt. 72-7

at 17-19.  Once again, some of these documents might be responsive to Plaintiff's request to

BOP—but his request to BOP was narrower than his request to OIG, and there is no basis in the

record to conclude that all of the OIG documents relate to Plaintiff's "alleged misconduct and

placement in the SHU" or the other particular topics he identified in requests to BOP.

For present purposes the critical question for the Court is whether BOP's declaration

shows that the agency conducted an adequate search for the records Plaintiff requested in 2005.

The Court concludes that it does not.  To prevail on a motion for summary judgment where the

adequacy of its search for records is challenged, BOP must provide a "reasonably detailed

affidavit, setting forth the search terms and the type of search performed, and averring that all

files likely to contain responsive materials (if such records exist) were searched."  *Oglesby v.*

*U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).  Although BOP's declaration states that

Plaintiff received documents in response to Plaintiff's 2005 requests, it contains no information

whatsoever about what record systems the agency searched, what search criteria it used, or

whether the agency reviewed the potentially responsive documents Plaintiff cites.  *See* Dkt. 68-6

¶ 13.  Although it may be the case that BOP has, in fact, produced all documents in its

possession that are responsive to Plaintiff's 2005 requests, BOP has not carried its burden on

summary judgment to prove that it has done so.  Therefore, in this respect, BOP's motion must

be denied.

Plaintiff also argues that BOP failed to provide a *Vaughn* index cataloguing and justifying its redactions to the three pages he has received in response to his 2005 requests. Dkt. 72 at 38. BOP responds, in a footnote in its reply, that it "does not believe that Patel's March 24, 2005 FOIA request . . . is at issue in this litigation and [BOP] therefore has not provided a *Vaughn* index" for the pages disclosed pursuant to that request. Dkt. 76 at 18 n.8. It does appear from the parties' briefing that there has been uncertainty regarding which of Plaintiff's FOIA requests are indeed at issue. Some of this uncertainty is attributable to a lack of specificity in Plaintiff's Complaint. *See* Dkt. 118 ¶ 155 (describing 2005 requests as "similar to" 2004 request to OIG, even though they appear to have sought substantially different—but potentially overlapping—sets of documents). The Court concludes, however, that, reasonably construed, the Complaint does place the February 15, 2005 FOIA request at issue in this litigation. Accordingly, BOP must provide Plaintiff a *Vaughn* index as to those three pages before it can obtain summary judgment in its favor.

Finally, Plaintiff contests redactions to the documents referred to BOP by OIG (pursuant to Plaintiff's separate OIG request) that were "'applied to protect the statements of inmates and staff who provided information for a BOP investigation.'" Dkt. 72 at 38 (quoting Dkt. 68-6, Exh. C). BOP argues that the statements at issue satisfy the criteria for FOIA exemptions 6 and 7(C). Exemption 6 permits agencies to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of privacy." 5 U.S.C. § 552(b)(6). Exemption 7(C) covers "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of privacy." *Id.* § 552(b)(7)(C). To rely on these exceptions, BOP must do more than merely recite that statements were withheld to protect individuals' privacy. Instead, it must show that the "privacy

interests that would be compromised by disclosure" outweigh "the public interest in release of the requested information." *Davis v. Dep't of Justice*, 968 F.2d 1276, 1281 (D.C. Cir. 1992).

Here, BOP has not provided a sufficiently detailed explanation of the privacy interests that it contends would be compromised by disclosure of the witness statements. It may be that the redaction of the names of witnesses and other persons mentioned in the statements is sufficient to guarantee the anonymity of these individuals—if so, then there is no apparent privacy interest protected by withholding the substance of the statements. If, on the other hand, the subject matter of the statements is such that its disclosure would facilitate the identification of witnesses or others even if their names were redacted, it is more likely that BOP will be entitled to a finding that exemptions 6 and 7(C) apply. To prevail on summary judgment, therefore, BOP needs to provide some evidence that the subject matter of the redacted statements itself is sufficient to identify particular individuals who have a privacy interest in remaining anonymous. BOP has not met that burden at this juncture.

Because BOP has not demonstrated that it conducted an adequate search for documents responsive to Plaintiff's 2005 FOIA requests, has not provided a *Vaughn* index cataloguing its redactions to the documents produced in response to those requests, and has not shown that FOIA exemptions 6 and 7(C) cover the content of the relevant statements even though the speakers remain anonymous, BOP's motion for summary judgment on Count IV of the Complaint is denied.

### 2. *Documents Related to Plaintiff's Protective Hearing*

Plaintiff also seeks to compel production of documents related to a protection hearing that took place while he was incarcerated at Moshannon Valley Correctional Center. Dkt. 118 ¶ 159. Plaintiff alleges that he received 247 pages in their entirety in response to this request, as well as 128 pages with redactions. *Id.* ¶ 160. He also asserts that several documents were

withheld in their entirety and that the BOP did not provide a *Vaughn* index cataloguing its assertions of FOIA exemptions.[4]  *Id.*  When BOP moved for summary judgment, it provided a *Vaughn* index identifying the sixteen documents withheld in their entirety and the basis for withholding each document.  Dkt. 68-5, Exh. 5.  It also described, in general terms, the bases for the redactions made to those documents produced in part, Dkt. 68-5 ¶¶ 10-15, and provided copies of the redacted documents with exemption designations indicated for each redaction, Dkt. 76-2 ¶ 5.  In his briefing, Plaintiff argues that BOP failed to demonstrate that there was no reasonably segregable non-exempt information in five of the documents that were withheld in their entirety, and that BOP erroneously asserted the deliberative process privilege to withhold a memorandum relating to Plaintiff's protective custody hearing.  Dkt. 72 at 41-43.

As an initial matter, the Court concludes that BOP's *Vaughn* index was adequate for present purposes. Taken together, the measures described above allow the Court to "conduct a meaningful de novo review of [BOP's] claim of an exemption."  *Brown v. FBI*, 675 F. Supp. 2d 122, 130 (D.D.C. 2009); *see Gallant v. NLRB*, 26 F.3d 168, 173 (D.C. Cir. 1994) ("the materials provided by the agency may take any form so long as they give the reviewing court a reasonable basis to evaluate the claim of privilege") (quotation marks and alterations omitted).  Although compiling a traditional *Vaughn* index would perhaps have allowed less cumbersome review of the redactions, the system employed by BOP in this case satisfied the functional requirements of *Vaughn* and its progeny.

Plaintiff's contention that BOP has failed to demonstrate that certain documents withheld in their entirety do not contain reasonably segregable non-exempt information has more merit.

---

[4]  BOP subsequently produced four previously pages with redactions and determined that six of them were non-responsive.  Dkt. 68-5 ¶ 3.  Thus, to date, 16 pages have been withheld in their entirety and 132 pages have been produced with redactions.  *Id.*

"[S]imply . . . showing that [a document] contains some exempt material" is not enough to "justify withholding [the] entire document." *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).  Instead, "non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *Id.*  The requirement in *Mead Data* that "an agency should . . . describe what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document," *id.* at 261, may have been "relaxed" by "more recent decisions," *Muttit v. Dep't of State*, 926 F. Supp. 2d 284, 310 (D.D.C. 2013).  But it remains the case that the government must carry its "burden of demonstrating that no reasonably segregable information exists" within withheld documents and that the Court must evaluate the agency's *Vaughn* index and declarations to determine whether the requisite showing has been made.  *Loving v. Dep't of Defense*, 550 F.3d 32, 41 (D.C. Cir. 2008) (quotation marks omitted).

Here, BOP's declaration states that "[e]very effort has been made to provide plaintiff with all reasonably segregable portions of the records requested;" that "[n]o reasonably segregable non-exempt portions of these records have been withheld from Plaintiff;" and that "no further information can be segregated without releasing information properly withheld" under various exemptions. Dkt. 68-5 ¶ 16.  BOP does not explain, however, *why* any of the withheld documents whose segregability Plaintiff contests cannot be further segregated.  This fact distinguishes this case from *Armstrong v. Executive Office of the President*, 97 F.3d 575 (D.C. Cir. 1996), where the government justified its entire withholding of particular pages with non-conclusory, document-by-document explanations.  *See, e.g.*, 97 F.3d at 579 (quoting government's assertion that note "'consists of an extensive review of numerous intelligence cables, revealing one piece of specific intelligence after another'"); *id.* at 580 (declaration asserted that specific "sensitive topics 'are discussed throughout the redacted segment and there

33

are no further intelligible segments which can be segregated'"").  Likewise, the agency in *Soto v. U.S. Dep't of State*, ___ F. Supp. 3d ___, 2015 WL 4692415, at *11 (D.D.C. Aug. 6, 2015), submitted an affidavit explaining that "the information in each responsive document [in that case] 'pertain[ed] exclusively to the issuance or refusal of a visa to enter the United States'" and was thus entirely exempt from disclosure under FOIA.  BOP has not made a similar showing that the documents at issue contain exclusively exempt information here.

The nature of the exemptions asserted to withhold the relevant documents here also cuts against a finding that BOP has met its burden.  For documents 1, 2, 5, 6, and 9 on its *Vaughn* index, BOP relies either largely or exclusively on the personal privacy exemptions (b)(6) and (b)(7)(C)—exemptions that under some circumstances might require only that identified individuals' names or other identifying information be redacted.  *See, e.g.*, *Paxson v. U.S. Dep't of Justice*, 41 F. Supp. 3d 55, 57-58 (D.D.C. 2014) (exemptions (b)(6) and (b)(7)(C) invoked to redact "names and other identifying information, like telephone numbers, of FBI Special Agents and support personnel").  This circumstance makes it particularly important, in this case, for BOP to provide some level of specific explanation why further segregation is not possible.

Finally, Plaintiff argues that BOP erroneously invoked exemption (b)(5), which protects memoranda and letters over which an agency could assert a privilege in litigation (*see Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980)), to withhold page 7 of "Document 1" in its *Vaughn* index.  BOP describes Document 1 as a "[m]emorandum" that was "created as a result of a hearing conducted for protective custody status."  Dkt. 68-5, Exh. 5.  In Plaintiff's view, BOP has "failed to establish that this document contains non-segregable pre-decisional information," which is subject to exemption (b)(5), rather than information "reporting a final decision and the reasoning of the decision maker, neither of which are exempt."  Dkt. 72 at 51 (citing *Coastal States*, 617 F.2d at 866).  BOP responds that it invoked exemption (b)(5)

because page 7 of Document 1 "reveal[s] pre-decisional information involved in the decision-making process that pertain[s] to protective custody of other inmates and the security of the institution."  Dkt. 76-2 ¶ 6.

BOP's current showing is insufficient to establish that the document in question is privileged.  When asserting the privilege to justify application of FOIA exemption (b)(5), "the agency has the burden of establishing what deliberative process is involved, and the role played by the documents in issue in the course of that process."  *Coastal States*, 617 F.2d at 868.  In a prison, there are presumably many different "decision-making process[es] that pertain to protective custody of other inmates" or "the security of the institution," and each of these processes presumably involves the creation of investigative or decisional memoranda.  BOP has provided no information regarding the "role played by the" redacted discussions in the process of determining whether to hold inmates in protective custody—or, indeed, any information relating to the nature of the "deliberation" at issue.  Without further detail, the Court is not in a position to determine whether exemption (b)(5) is applicable.

## IV. CONCLUSION

For the reasons stated above, Defendants' motion to dismiss or, in the alternative, for summary judgment, is **GRANTED** in part and **DENIED** in part.  Defendants' motion for summary judgment on the RFRA claim against Defendant Lappin is **GRANTED**.  The Court defers ruling as to Plaintiff's RFRA claims against the John Doe Defendants and his Equal Protection Clause claim against Defendant Clark until those parties have had an opportunity to file dispositive motions.  BOP's motion to dismiss Plaintiff's Privacy Act claim is **DENIED**.  BOP's motion for summary judgment on Plaintiff's remaining FOIA claims is **DENIED**.

BOP's motion for protective order (Dkt. 82), which seeks to stay discovery pending resolution of BOP's motion to dismiss or, in the alternative, for summary judgment, is **DENIED** as moot.

The parties shall appear for a status conference on September 3, 2015, at 10:30 AM in Courtroom 21, to discuss the schedule for discovery and any additional anticipated dispositive motions.

An appropriate Order accompanies this Memorandum Opinion.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  August 21, 2015